Filed 4/7/15  P. v. Morales CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. JAIME MORALES et al., Defendants and Appellants. | B250716 (Los Angeles County Super. Ct. No. PA073081) |

APPEAL from judgments of the Superior Court of Los Angeles County, Dalila Corral Lyons, Judge.  Affirmed in part, reversed in part, and remanded.

Benjamin Owens, under appointment by the Court of Appeal, for Defendant and Appellant Jaime Morales.

Alex Coolman, under appointment by the Court of Appeal, for Defendant and Appellant Teresa Reyes Morales.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Tannaz Kouhpainezhad, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Jaime Morales appeals his convictions for possession for sale of cocaine and methamphetamine, possession of a controlled substance with a firearm, and misdemeanor possession of a bird for fighting. His wife, appellant Teresa Reyes Morales,[1] appeals her convictions for possession of a firearm by a felon, possession of ammunition, and misdemeanor possession of a bird for fighting. Jaime contends the trial court erred by denying a mistrial after the presentation of evidence that was ultimately excluded. Both appellants contend the trial court made various instructional errors. We agree that the trial court prejudicially erred by failing to instruct on the lesser included offense of simple possession of a controlled substance on count 3, and accordingly reverse Jaime's conviction for possession of a controlled substance with a firearm. In all other respects, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts*

a. *People's evidence*

The evidence relevant to the issues presented on appeal was as follows.

(i) *The search of appellants' property*

A. *The narcotics and the firearm*

In 2012, Officer Ruben Jimenez of the Los Angeles Police Department (L.A.P.D.) Mission Area Narcotics Enforcement Detail, along with other officers, monitored appellants' property to determine whether narcotics activity was occurring there. During surveillance, Jiminez observed an individual arrive at the residence, go inside for five minutes, get back in his vehicle, and drive away. Officers followed and stopped the individual (identified in the parties' pretrial motions as a Mr. Mora) and found methamphetamine and marijuana in the vehicle. Officer Jimenez obtained a search warrant for the Morales property.

---

[1] For ease of reference, we sometimes hereinafter refer to appellants and other members of the Morales family by their first names.

On the afternoon of March 1, 2012, at approximately 2:00 p.m., Officer Jimenez, along with several other L.A.P.D. detectives and officers, executed the warrant. Only Teresa and Jaime were present at the home at the time; their two sons, aged 18 and 10 years old, were not present.

The Morales property included a sizeable backyard that extended over 50 feet from the house. In the backyard were a shed and one or more open outbuildings. There was also a detached garage, separated from the house by a walkway. Officers searched the house, garage, and backyard shed. In the shed, they discovered a baggie containing 2.02 net grams of cocaine, in a yellow sandwich bag box (item 1); a baggie containing 2.33 net grams of methamphetamine, in the same yellow sandwich bag box (item 3); a baggie containing 5.70 net grams of methamphetamine on top of a work bench (item 2); a digital scale; and, on top of a table, mail bearing Jaime's name and address. In an enclosed garden area behind the shed, officers found six immature marijuana plants.

In the house, officers discovered $700 in cash on a living room bookshelf; $7,442 in cash in a drawer in appellants' bedroom dresser; and an operable .357 caliber revolver, loaded with seven live rounds, and a government-issued benefits card in Teresa's name, in a different drawer in the same bedroom dresser. In Jaime's right pants pocket was a wallet containing $1,910 in cash. The search lasted between three and four hours. A drug detection canine, "Coda," assisted in the search, but the dog handler declined to have Coda enter the garage due to the large amount of glassware on shelves and on the floor.

Appellants were transported to the police station. Officer Jimenez told Jaime the officers had discovered narcotics in unspecified locations on the property. Jaime responded that " 'all the narcotics' " were his, including those in the shed and in a coffee cup in the garage. Based upon these statements, Jimenez obtained a second warrant, and officers returned to the property and conducted a second search of the garage. During the second search, they discovered a baggie containing 31.17 net grams of cocaine, in a silver thermal coffee mug in the garage (item 6). Officer Jimenez also discovered a baggie containing 40.18 net grams of a crystalline substance that he believed was

methamphetamine, from a cabinet shelf in the garage (item 4). Testing, however, revealed the substance in item 4 was not methamphetamine or contraband.

Testifying as an expert, Officer Jimenez explained that a usable dose of cocaine or methamphetamine may be as small as .02 grams. Assuming a usable dose was .02 grams, the baggie of cocaine found in the shed contained enough for 101 individual doses; the baggies of methamphetamine found in the shed contained enough for 115 and 285 individual doses; and the baggie of cocaine found in the coffee mug contained enough for over 1,500 doses. In Jimenez's experience users, as opposed to sellers, typically possess less than a gram of narcotics. Based on the quantities of narcotics, the fact both cocaine and methamphetamine were found, the large sum of cash, and the presence of a loaded gun, a scale, and baggies, Officer Jimenez opined that appellants possessed the narcotics for sale.

Teresa told Officer Jimenez that the gun found in the dresser was hers. A records check revealed that the gun was legally registered to her, and she had purchased it on December 16, 2005. When purchasing the gun, Teresa had filled out paperwork in which she stated under penalty of perjury that she had not been convicted of a felony. The parties stipulated that Teresa had been convicted of a felony in 1992. Officers did not find a gun safe on the property.

B. *Cockfighting*

After discovering numerous game fowl in coops in the back portion of the property, near the shed, the narcotics officers contacted the animal cruelty task force. Officer James Cherrette inspected the property and discovered over 200 game fowl, a particular type of fowl bred to be aggressive and used for cockfighting. Approximately 128 were roosters. The roosters' ear lobes, combs, and wattles had been removed, a practice designed to prevent bleeding during cockfights. Their spurs had been chopped off or filed down to facilitate the attachment of "slasher" knives during cockfights. The roosters were housed in individual coops, primarily large "free-flight" pens that allowed them to fly to a perch, thereby increasing their wing strength. Syringes, vitamins, supplements, antibiotics, and a second scale were found in the shed or the area near the

4

coops. One of the narcotics officers found a pair of small leather boxing mitts in the chicken coop area. Such mitts, or "sparring muffs," are typically placed over a rooster's spur to protect the bird during training or demonstrations of its fighting ability. Officer Cherrette conducted a "temperament test" on one of the birds and determined it was aggressive. Based on the totality of the circumstances, Cherrette opined that the birds were being raised for cockfighting.

Teresa signed a form acknowledging ownership of the birds and relinquishing them to animal services.

In 2007, police had been called to the Morales residence to investigate a cockfight. They found living, dead, and injured roosters. Both appellants were present at the time. Jaime told authorities that his cousin Pepe wanted to hold a cockfight at the Morales residence, but Jaime did not give him permission to do so. At that time, Jaime admitted owning some of the roosters.

b. *Defense evidence*

Jaime presented the following evidence in his defense. Crystal Lopez testified that she had stayed with the Moraleses at their home a few days a week since 2008; they were loving people who helped her and treated her like a daughter. She had not observed any activity that led her to believe they were involved in narcotics sales or cockfighting. The back portion of the property, which was fenced, was leased to a tenant, Jesus Ochoa. Lopez never saw appellants go to that portion of the property. However, Ochoa visited the rented portion of the property on a daily basis; sometimes he was accompanied by other persons. The Moraleses did not drink coffee, and she had never seen either appellant with a Thermos-type coffee cup like that found in the garage. Lopez had observed a black safe in the bedroom closet. In March 2012, neither appellant was working.

Appellants' 19-year-old son, Jose Morales, testified that he had never seen his parents use a coffee thermos, had never seen narcotics at the home, and had never seen his parents engage in a drug transaction. Both his parents were unemployed in March 2012. Approximately two months before the search, Teresa was happy because she

5

received a large sum of money related to an accident she had suffered. Ochoa had rented the back portion of the property for approximately seven years. Ochoa kept his roosters there, and used the shed to store items. When Ochoa visited the property, he was sometimes accompanied by four or five other persons. The shed was sometimes locked, and Ochoa had a key; Jose had seen him use the key to enter the shed. As of March 2012, Jaime and Teresa also owned between four and ten roosters. Their roosters had not had their wattles, combs, or spurs cut. In 2007 Jose and Teresa arrived home to find police at the residence. The officers asked if Jose had seen "rooster fights." Jose had not observed any cockfights at his parents' property. Jose was present when his mother purchased the gun. She bought a gun safe at the same time. Jose never saw the safe in the house until the night his parents were arrested; that night, he observed the gun safe, open on their bed.

Jesus Ochoa briefly testified that he rented the back portion of the property and visited every day after work. Outside the jury's presence Ochoa invoked his Fifth Amendment right to remain silent when asked whether the birds belonged to him. Consequently, the trial court struck Ochoa's testimony.

c. *People's rebuttal evidence*

When officers conducted the search on March 1, 2012, Tamarlyn Shepphird, an animal control officer for the City of Los Angeles, was called to the Morales property regarding the game fowl. Teresa signed an animal release form under penalty of perjury, stating that she was the lawful owner or custodian of the birds and relinquishing them to animal services. Teresa did not check the boxes on the form stating that she was either the legal owner or authorized to act for the owner. Teresa did not state that someone else owned the birds.

2. *Procedure*

Trial was by jury. Jaime was convicted of possession for sale of cocaine (Health & Saf. Code, § 11351) and methamphetamine (Health & Saf. Code, § 11378), and possession of a controlled substance with a firearm (Health & Saf. Code, § 11370.1, subd. (a)). Teresa was convicted of possession of a firearm by a felon (Pen. Code,

6

§ 29800, subd. (a)(1)),[2] and possession of ammunition (§ 30305, subd. (a)(1)). Both appellants were convicted of misdemeanor possession of a bird or animal for fighting (§ 597j, subd. (a)).[3] Teresa stipulated that she had suffered two prior narcotics-related convictions.

The trial court sentenced Jaime and Teresa to terms of 4 and 2 years in prison, respectively. It imposed a restitution fine, a suspended parole restitution fine, a criminal conviction assessment, and a court operations assessment on each appellant. Jaime and Teresa appeal.

DISCUSSION

1. *Denial of mistrial motion*

a. *Additional facts*

(i) *The pretrial motion to disclose the confidential informant's identity*

Prior to trial, appellants moved for disclosure of the identity of a confidential informant.[4] Jaime's motion averred that an affidavit in support of the search warrant stated the following: A " 'Source of Information (SOI) . . . stated that a male [H]ispanic . . . approximately 50 years old and a male [H]ispanic . . . approximately 25 years old, are dealing cocaine and methamphetamine out of the residence at 11501 Sproule Avenue.' " On January 20, 2012, officers "observed a Mr. Mora exit this residence and conducted a traffic stop on his vehicle. A search of this vehicle yielded 'a crystal like . . . substance resembling methamphetamine and a plastic baggy containing a green leafy . . . substance resembling marijuana.' " Jaime argued, in his motion and at the hearing on the motion, that the "SOI" did not know the identity of the two men who were allegedly selling the

---

[2]     All further undesignated statutory references are to the Penal Code.

[3]     The jury acquitted both appellants of child endangerment. It also acquitted Teresa of possession of cocaine and methamphetamine for sale, and possession of a controlled substance with a firearm.

[4]     Teresa's motion was heard and denied after Jaime's. Because Teresa was acquitted of all narcotics charges, we limit our discussion to Jaime's motion.

methamphetamine, and Mora had not stated who provided him with the drugs. Therefore, the SOI would be able to testify that someone other than Jaime sold the drugs, leading to the inference that someone other than Jaime was the sole possessor of the drugs.

In response, the People argued that the SOI was not present when officers executed the warrant on March 1. Given that appellants were charged with possession for sale, not sales, the SOI was not a material witness. Disclosing the informant's identity would place the informant in danger.

The trial court denied the motion. It reasoned that "this is not a sales case, this is a possession for sale," so the issue of who sold the narcotics was not germane. Moreover, Jaime's defense motion was unsupported by a declaration signed under penalty of perjury.

(ii) *Officer Jimenez's trial testimony regarding the controlled drug buy*

During direct examination, Officer Jimenez testified that before he prepared the search warrant, a confidential informant conducted a controlled drug buy at the Morales residence. Jimenez testified that officers sent a "confidential, reliable informant" to the Morales home, and the informant "successfully purchased narcotics from the location, which we recovered from the informant and booked it as evidence." Teresa's counsel objected that there was no foundation for the fact the informant was confidential or reliable. The trial court overruled the objection. The prosecutor then established that the informant was searched for narcotics prior to the controlled buy. Teresa's counsel objected "based on an earlier motion heard by the court." The court and parties conducted an unreported sidebar conference.

After jurors were dismissed for the day, Jaime, joined by Teresa, moved for a mistrial based on Jimenez's testimony. Counsel averred that the defense had not been provided with any discovery regarding the controlled buy. The trial court denied the mistrial motion but ordered the prosecutor to provide "any information that [she] can provide" to the defendants to allow for sufficient cross-examination of Jimenez regarding the issue.

8

The next day the prosecutor represented she had informed defense counsel that the informant had met with Officer Jimenez at a prearranged location; the informant and the informant's vehicle were searched; officers followed the informant to the Morales residence, watched the informant walk into the residence, and waited while the informant remained inside for one to two minutes; the informant then exited the Morales house and drove back to the prearranged location while officers followed. Officers searched the informant and discovered narcotics. The informant did not identify either appellant as the seller. The prosecutor stated she was unable to provide further information without divulging the informant's identity or otherwise putting his or her safety at risk.[5] The defense contended this information was inadequate.

The prosecutor proposed two remedies for the improper admission of the evidence: the challenged testimony could be stricken from the record, or Jimenez could testify that the informant did not identify either appellant as the person or persons who sold the informant the drugs. Teresa's counsel requested that the trial court strike the testimony. Jaime's counsel objected that the remedy of striking the testimony was insufficient to cure the prejudicial effect of the evidence; it was tantamount to "unringing a bell that can't be unrung." He demanded that either (1) the trial court grant a mistrial, or (2) further discovery be provided regarding the informant.

The trial court declined to reconsider its denial of the mistrial motion. It ordered Jimenez's testimony regarding the controlled buy stricken. Before further presentation of evidence the trial court admonished the jury that the evidence had been stricken and could not be considered.[6]

---

[5]    While the record is not entirely clear, it appears the "SOI" discussed in the pretrial motion was the same person as the confidential informant who conducted the controlled buy.

[6]    The trial court stated: "Yesterday Detective Jimenez testified about a controlled buy of what appeared to be narcotics by an informant at the defendant's residence. That testimony is stricken from the record. So you must disregard it and must not consider that testimony for any purpose. This applies only to that very specific testimony."

b. *Discussion*

Jaime contends that the trial court erred by denying his motion for a mistrial. He urges that because the evidence was circumstantial and not overwhelming, striking the testimony was insufficient and the denial of the mistrial motion was an abuse of discretion.[7]

" ' "A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]" [Citation.]' " (*People v. Edwards* (2013) 57 Cal.4th 658, 703; *People v. Lightsey* (2012) 54 Cal.4th 668, 718; *People v. Dement* (2011) 53 Cal.4th 1, 39-40.) A motion for a mistrial should be granted only when a defendant's chances of receiving a fair trial have been irreparably damaged. (*People v. Edwards, supra,* at p. 703; *People v. Jablonski* (2006) 37 Cal.4th 774, 828; *People v. Bolden* (2002) 29 Cal.4th 515, 555.) "Whether a particular incident is so prejudicial that it warrants a mistrial 'requires a nuanced, fact-based analysis,' which is best performed by the trial court." (*People v. Dunn* (2012) 205 Cal.App.4th 1086, 1094.) Accordingly, we review the trial court's ruling denying a mistrial motion, and its reliance on a curative instruction in place of a mistrial, for abuse of discretion. (*People v. Lightsey, supra,* at p. 718; *People v. Elliott* (2012) 53 Cal.4th 535, 575; *People v. Navarrete* (2010) 181 Cal.App.4th 828, 834.)

There was no dispute that the evidence regarding the controlled buy by the confidential informant was inadmissible; thus, the only issue before us is whether the remedy selected by the trial court, striking the testimony, was adequate. "Ordinarily, a curative instruction to disregard improper testimony is sufficient to protect a defendant

---

[7] Jaime also argues that, had he known of the controlled buy before trial, he "would have had a better chance of obtaining the informant's identity in a pretrial motion." We do not understand Jaime to challenge the trial court's denial of the motion to disclose the informant's identity on appeal. Therefore, we do not address this point.

from the injury of such testimony, and, ordinarily, we presume a jury is capable of following such an instruction." (*People v. Navarrete, supra,* 181 Cal.App.4th at p. 834; *People v. Allen* (1978) 77 Cal.App.3d 924, 934-935; *People v. Sims* (1976) 64 Cal.App.3d 544, 554-555 [jury is presumed to follow an admonition to disregard evidence].) "It is only in the exceptional case that 'the improper subject matter is of such a character that its effect . . . cannot be removed by the court's admonitions.' " (*People v. Allen, supra,* at p. 935.)

Courts have found such exceptional cases in a variety of circumstances. In *People v. Navarrete, supra,* 181 Cal.App.4th 834, a detective willfully and in bad faith volunteered that the defendant had confessed to the charged crime, committing a lewd act upon a child. The appellate court found striking the testimony and admonishing the jury to disregard it was an inadequate remedy, because a jury's belief that a defendant may have confessed eviscerates the presumption of innocence and "even a single reference to an inadmissible confession can be the sort of 'exceptional circumstance' that supports granting a mistrial because a curative instruction cannot undo the prejudice to the defendant." (*Id.* at p. 836.) In *People v. McKelvey* (1927) 85 Cal.App. 769, 770-771, five credible witnesses testified for the prosecution that the defendant's reputation for morality and virtue was bad. This error was not cured by the fact the trial court later struck the testimony and instructed the jury to disregard it: "It was an intellectual impossibility for the jury to wholly erase such testimony from their memory . . . ." (*Id.* at p. 771.) In *People v. Brophy* (1954) 122 Cal.App.2d 638, 652, defense counsel argued during closing that the fact a bullet was missing supported the defense case. The prosecutor, in closing, displayed the missing bullet, which had not been introduced into evidence. This misconduct was "so highly prejudicial that no admonition of the trial judge to disregard it could erase from the minds of the jurors the undoubted electric effect of the production of the bullet and the remarks of the prosecutor in response to the argument of appellant's counsel." (*Id.* at p. 652.)

Courts have also held improperly admitted evidence necessitates a mistrial where the evidence in the case is close, or where the improper evidence was admitted as the

11

result of misconduct. (See, e.g., *People v. Ozuna* (1963) 213 Cal.App.2d 338, 339-342 [statement that defendant was an ex-convict was incurable by admonition where it resulted from calculated misconduct, the evidence was close, and defendant's first jury deadlocked]; *People v. Figuieredo* (1955) 130 Cal.App.2d 498, 505-506 [prosecutor intentionally elicited testimony that defendant had "done time" in San Quentin, after assuring defendant that if he admitted his prior convictions they would not be disclosed to the jury]; *People v. Allen, supra,* 77 Cal.App.3d at p. 935 [reference to defendant's parole status incurable where the case was "extremely close" and turned on witness credibility].)

On the other hand, courts have found curative instructions sufficient to dispel prejudice when the evidence in question was brief and isolated, or trivial in comparison with the other evidence in the case (*People v. Edwards, supra,* 57 Cal.4th at pp. 702-704; *People v. Carter* (2005) 36 Cal.4th 1114, 1180-1182 [stricken evidence showing defendant visited casino after murders was trivial relative to other evidence, and curative instruction was adequate]); was oblique or ambiguous (*People v. Lightsey, supra,* 54 Cal.4th at pp. 717-719 [jurors would not have inferred from vague references to "Wasco" that defendant was imprisoned]; *People v. Elliott, supra,* 53 Cal.4th at pp. 574-576; *People v. Bolden, supra,* 29 Cal.4th at pp. 554-555 [jurors were unlikely to infer, from a fleeting reference to a parole office, that the defendant had a prior felony]; *People v. Collins* (2010) 49 Cal.4th 175, 196-199 [prejudice curable where witness's statements about defendant's phone calls from prison were brief and ambiguous]; *People v. Garcia* (2014) 229 Cal.App.4th 302, 311-312 [where, at the time mistrial motion was made, prosecutor's questions amounted to innuendo that the defendant was a lesbian, denial was not an abuse of discretion]); did not go to the central issue at trial (*People v. Cox* (2003) 30 Cal.4th 916, 960-961, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22); or was duplicative of other, properly admitted evidence (*People v. Edwards, supra,* at p. 703 [prosecutor's brief reference to defendant's arrest was cured by admonition because the jury would already surmise he had been arrested for the offense in question]; *People v. Dement, supra,* 53 Cal.4th at p. 40 [witness's improper

comment that defendant had bragged about the uncharged killing of his brother was largely duplicative of evidence the jury properly received]).

Whether the curative instruction was sufficient to dispel any prejudice here presents a close question. The officer's testimony was neither vague nor ambiguous. The testimony was not inadvertently elicited. The prosecutor directly asked whether the officers "work[ed] with any informant," and then queried, "How did that work? What did you do with the informant?" Thus, the prosecutor appears to have elicited the testimony knowing that the People had not provided discovery about the controlled buy. Her only attempt to justify this course of action was to observe that the defendants were aware there was an informant, as demonstrated by their motions to disclose the informant's identity. But the prosecutor did not disagree when defense counsel pointed out that the warrant affidavit did not suggest a controlled buy had occurred. Moreover, the People averred, in connection with the motion to disclose the "SOI's" identity, that the witness was not material, and did not alert the court or parties to the fact the People intended to elicit evidence of the controlled buy at trial.[8] And, unlike cases in which the challenged evidence was tangential or trivial, here the evidence went to a central issue at trial: whether the drugs were possessed for sale. From the fact a sale occurred, the jury could infer the drugs were possessed for the purpose of sale.

Despite the foregoing, in our view this was not the sort of exceptional case in which jurors would be unable to abide by the court's instruction to disregard the evidence. Testimony regarding the drug buy did not pose the same danger of incurable prejudice present when, for example, evidence of a confession, or extensive character evidence, is improperly admitted. (Cf. *People v. Navarrete, supra,* 181 Cal.App.4th at p. 836; *People v. McKelvey, supra,* 85 Cal.App. at p. 771.) The controlled buy evidence, while not precisely duplicative, was echoed by evidence that Mora briefly visited the Morales home and was found immediately thereafter with methamphetamine. While

---

**8**    A different prosecutor appeared at the hearing on the motion to disclose the informant's identity.

13

Mora was not asked, and did not state, where he obtained the contraband, it was a reasonable inference that it was from the Morales home.

Jaime cites *People v. Johnson* (1964) 229 Cal.App.2d 162, for the proposition that " 'Ordinarily the admission of incompetent evidence cannot be cured by striking it and instructing the jury to disregard it when it goes to a main issue of the case and when other evidence of guilt is not clear and convincing. [Citations.]' " (*Id.* at p. 170.) But here, the evidence of guilt was clear and convincing. There was strong evidence the drugs were possessed for sale. Over 33 net grams of cocaine were found in the shed and the garage. Approximately 8 net grams of methamphetamine were found in the shed. According to Officer Jimenez, who testified as an expert, as little as .02 grams of these substances is a usable quantity. Using that baseline, the cocaine found on the property was equal to over 1,500 uses, and the methamphetamine was equal to approximately 400 uses. Even assuming the .02 gram figure was unrealistically low, as the defense contended at trial, the quantities found were obviously far more than those needed for an individual's own use.[9] Jaime is correct that Officer Jiminez testified that the amounts in two of the baggies found in the shed (2.02 net grams of cocaine, and 2.33 net grams of methamphetamine) were possibly consistent with personal use. However, Jimenez did not testify that the baggie of 31.17 net grams of cocaine found in the coffee mug in the garage was consistent with personal use. To the contrary, Jimenez opined that the drugs were possessed for sale in part due to the quantities present. Moreover, the large amount of cash found in the dresser and on Jaime's person, the presence of the scale, and the fact both cocaine and methamphetamine were found, all pointed to possession for sale. No evidence suggested Jaime (or anyone else) possessed the drugs for personal use only.

---

[9] The People argue that item 4, the baggie containing over 40 net grams of a crystalline substance, also showed possession for sale given that it would have supplied "over 2,000 uses of methamphetamine." However, the People are mistaken. Item 4 was tested and found not to contain methamphetamine; there was no evidence it contained any controlled substance.

14

There was also compelling evidence that Jaime, rather than some other person who had access to the shed and the garage, was the possessor of the cocaine and methamphetamine. Officer Jiminez testified that Jaime admitted all the drugs were his, and told him about the cocaine in the coffee mug, which officers had not yet found. No evidence directly rebutted this testimony. Moreover, Jaime had over $1,900 in his wallet when officers served the warrant. An additional $7,442 was found in the bedroom dresser, and $700 more was on a living room shelf. The unexplained presence of over $10,000 in cash strongly suggested Jaime was involved in a drug sale operation. Given these circumstances, the trial court did not abuse its discretion by denying the motion for a mistrial. (See generally *People v. Harris* (1994) 22 Cal.App.4th 1575, 1580-1581 [evidence of parole status harmless in light of overwhelming evidence of guilt]; *People v. Clark* (2011) 52 Cal.4th 856, 958-960 [officer's testimony that defendant failed to react to accusations of murder was an improper reference to his invocation of right to silence; however, any potential prejudice from the testimony could be cured by prompt admonition to jury to disregard the stricken evidence].)

For the same reasons, even if the trial court erred by denying the mistrial motion, admission of the evidence was harmless because it was not reasonably probable Jaime would have obtained a more favorable result had it been excluded. (See Evid. Code, § 353; *People v. Richardson* (2008) 43 Cal.4th 959, 1001 [the erroneous admission of evidence requires reversal only where it is reasonably probable the defendant would have received a more favorable result in the absence of the error]; *People v. Earp* (1999) 20 Cal.4th 826, 878; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

2. *Jury instructions*

a. *Failure to instruct on simple possession of methamphetamine and cocaine*

The defense did not request instructions on the lesser included offenses of simple possession of methamphetamine or cocaine, and the trial court did not give them. Jaime contends this was prejudicial error.

A trial court must instruct the jury on all general principles of law relevant to the issues raised by the evidence, including lesser included offenses, whether or not the

defendant makes a formal request. Instruction on a lesser included offense is required when there is evidence that indicates the defendant is guilty of the lesser offense but not of the greater. (*People v. Banks* (2014) 59 Cal.4th 1113, 1159; *People v. Whalen* (2013) 56 Cal.4th 1, 68-69; *People v. Thomas* (2012) 53 Cal.4th 771, 813.) Substantial evidence is evidence that a reasonable jury could find persuasive. (*People v. Benavides* (2005) 35 Cal.4th 69, 102.) The existence of any evidence, no matter how weak, will not justify instructions on a lesser included offense. (*People v. Whalen, supra*, at p. 68; *People v. Wyatt* (2012) 55 Cal.4th 694, 698.) In deciding whether there is substantial evidence we do not evaluate the credibility of the witnesses, a task for the jury. (*People v. Wyatt, supra*, at p. 698.) We independently review the question of whether the trial court erred by failing to instruct on a lesser included offense. (*People v. Banks, supra,* at p. 1160; *People v. Booker* (2011) 51 Cal.4th 141, 181.)

Simple possession of a controlled substance is a lesser included offense of possession of the same substance for sale. (See *People v. Becker* (2010) 183 Cal.App.4th 1151, 1157; *People v. Oldham* (2000) 81 Cal.App.4th 1, 16; *People v. Magana* (1990) 218 Cal.App.3d 951, 954.) Therefore, if there was substantial evidence to show Jaime was guilty of possession of methamphetamine or cocaine, but not possession for sale, the trial court should have sua sponte instructed on the lesser offenses.

Jaime asserts that the following evidence was sufficient to require instructions on simple possession. (1) Jose testified that he never saw his parents, or anyone else on the property, engage in drug sales. Lopez testified that she had never observed any activity suggesting appellants were selling narcotics and never observed unusual traffic in and out of the home. (2) The gun was not kept with the narcotics, but was in the bedroom. Jose's testimony that after his parents were arrested, he saw the gun safe lying open in his parents' bedroom, suggested the gun was kept in the safe, rather than "at the ready" for use in a drug deal. (3) The 31.17 grams of cocaine in the coffee cup in the garage—the largest quantity found—was planted by police, because Lopez had never seen the cup before, and the dog did not alert to it during the first search. (4) There was a legitimate source for the cash found in the search, namely, Teresa's recovery for her accident.

16

(5) Officer Jimenez testified that he did not have knowledge of the "physiological properties" of cocaine and did not know how much cocaine or methamphetamine was required for a user to get "high."

We are not convinced that the foregoing amounted to substantial evidence of simple possession. First, there was no evidence that appellants, or anyone else on the property, were drug users. There was, for example, no drug paraphernalia found in the searches. Contrary to Jaime's argument, there was no substantial evidence the 31.17 grams of cocaine in the coffee cup in the garage was planted. Jaime's argument is based on his theory that after finding drugs in a quantity insufficient to support a possession for sale charge in the first search, officers returned and planted the larger quantity of cocaine in the coffee cup in the garage during the second search. Appellants theorized in argument below that Coda, the drug detection canine, would have alerted to the drugs in the garage during the initial search, and Officer Jimenez's explanation of why Coda did not enter the garage was incredible. These arguments are highly speculative and do not amount to substantial evidence that the larger quantity of cocaine was planted. Officer Jimenez testified that there were numerous candles in glass containers and other glassware on shelves on three sides of the garage, as well as additional glass candles on the garage floor. Drug detection dogs tend to get "hyper" when working and may knock things over, and the dog handler did not allow Coda into the garage because he could have been injured by broken glass. In our view, the record did not contain substantial evidence from which a reasonable jury could find Jaime possessed only the smaller amounts of contraband, and the baggie containing the larger amount was planted.

*People v. Saldana* (1984) 157 Cal.App.3d 443 and *People v. Tinajero* (1993) 19 Cal.App.4th 1541, cited by Jaime, do not persuade us that instructions on simple possession were required. In *Saldana*, officers found the defendant, a nonuser of heroin, lying on his mother's bed, in a room he shared with her. He reached inside the headboard as officers arrived, and officers found 18 balloons of heroin therein. Two of defendant's brothers were found in the basement; one was a known user and seller of heroin, and was under the influence of heroin when officers arrived. Officers found materials related to

17

both sales and use in the basement. (*Saldana*, at pp. 450-452, 455.) The jury was instructed that joint or constructive possession was sufficient to prove the possession element of possession for sale. (*Id.* at p. 453.) *Saldana* held the trial court's failure to sua sponte instruct on the lesser included offense of simple possession was reversible error. (*Id.* at p. 453.) The court held that where there is direct evidence of simple possession, but only circumstantial evidence of intent to sell, a jury must be instructed on both simple possession and possession for sale. (*Id.* at p. 456.) Saldana's jury could have inferred that the brother stashed the heroin in the headboard, and the defendant, who had constructive possession, attempted to hide it when police arrived; or, the defendant might have possessed the heroin for the brother, a known user. (*Id.* at pp. 457-458.) But no similar evidence was present here. There was no evidence anyone on the property was a drug user, and no showing that another person was engaged in selling drugs on the property.

In *Tinajero,* the evidence showed the defendant discussed selling several kilos of cocaine with an undercover police officer. Defendant arrived at the prearranged sale location with a kilo of cocaine. The undercover officer took the package, but backup officers arrested defendant before he had actually taken possession of the $15,000 payment. (*People v. Tinajero, supra,* 19 Cal.App.4th at pp. 1544-1545.) There was conflicting evidence whether the parties had discussed the sales price beforehand. Defendant was convicted of the sale or transport of cocaine. (*Id.* at pp. 1545-1546.) *Tinajero* held that the trial court should have sua sponte instructed on the lesser included offenses of possession for sale and simple possession in light of evidence the sale was never completed and the conflict regarding the discussions about the sales price; however, the error was harmless given the overwhelming evidence of transportation. (*Id.* at pp. 1547, 1551-1552.) Unlike in *Tinajero,* in the instant case there was no evidence suggesting an uncompleted sale, and Jaime was not charged with sales. To the extent *Tinajero* concluded that an instruction on simple possession was required, we disagree. *Tinajero* offered no meaningful analysis on the point, and we fail to see how a

jury could reasonably convict a defendant, who brings a kilo of cocaine to a planned drug sale, of only simple possession.

In any event, assuming arguendo that there was substantial evidence requiring the trial court to instruct on simple possession sua sponte, we discern no prejudicial error. "The failure to instruct on a lesser included offense in a noncapital case does not require reversal 'unless an examination of the entire record establishes a reasonable probability that the error affected the outcome.' " (*People v. Wyatt, supra*, 55 Cal.4th at p. 698; *People v. Beltran* (2013) 56 Cal.4th 935, 955; *People v. Breverman* (1998) 19 Cal.4th 142, 165.) There is no such reasonable probability here. As noted, there was no evidence whatsoever suggesting appellants were drug users. Jaime's defense was not based on the theory that the drugs were possessed only for personal use; his counsel did not make such an argument to the jury. The theory that police planted the larger quantity of cocaine was speculative. Even assuming arguendo that .02 grams is an underestimate of a useable amount of narcotics, the quantities found still provided many more doses than that necessary for personal use. And, if the jury credited Jose's testimony that Teresa obtained a substantial sum of money as compensation for her accident, it would likely have nonetheless questioned why such a large sum was sitting around the house. The presence of more than one type of drug, the discovery that Mora was in possession of methamphetamine after leaving the Morales residence, and Jimenez's expert opinion all provided further proof of possession for sale. In sum, even if the instruction should have been given, its omission was harmless error.

b. *Failure to instruct on simple possession on count 3*

Jaime also contends the trial court erred by failing to instruct on simple possession on count 3, possession of a controlled substance with a firearm. " 'For purposes of determining a trial court's instructional duties,' " our Supreme Court has said " 'that "a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, *or the facts actually alleged in the accusatory pleading*, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." ' [Citation.] When applying the accusatory pleading test, '[t]he

19

trial court need only examine the accusatory pleading.' [Citation.] '[S]o long as the prosecution has chosen to allege a way of committing the greater offense that necessarily subsumes a lesser offense, and so long as there is substantial evidence that the defendant committed the lesser offense without also committing the greater, the trial court must instruct on the lesser included offense.' [Citation.]" (*People v. Banks, supra,* 59 Cal.4th at p. 1160; *People v. James* (2014) 230 Cal.App.4th 1256, 1260-1262.)

Jaime acknowledges that possession of methamphetamine or cocaine is not a lesser included offense of possession of those substances while armed under the elements test. (See *People v. Williams* (2009) 170 Cal.App.4th 587, 644-645 [applying the "elements" test, possession of methamphetamine under Health & Saf. Code, § 11377, subd. (a) is not a lesser offense of possession of a controlled substance while armed under Health & Saf. Code, § 11370.1, subd. (a), because a violation of § 11370.1 may be based on possession of heroin or cocaine, among other substances, that are not included in § 11377, subd. (a); therefore, § 11370.1 may be violated without necessarily violating § 11377, subd. (a)]; *People v. Sosa* (2012) 210 Cal.App.4th 946, 949 [it is possible to violate Health & Saf. Code, § 11370.1, subd. (a) without violating Health & Saf. Code, § 11350, subd. (a), because the lists of controlled substances in the two statutes differ].)

However, Jaime argues that the offenses are lesser included under the accusatory pleading test. The People do not dispute the point. We agree. The information here specified the particular substances in question. It alleged, as to Count 3: "On or about March 1, 2012, in the County of Los Angeles, the crime of possession of a controlled substance with firearm, in violation of Health & Safety Code section 11370.1(a), a [f]elony, was committed by Jaime Morales and Teresa Reyes Morales, who did unlawfully possess cocaine and methamphetamine while armed with a loaded, operable firearm, to wit: a .357 cal. handgun." Therefore, based on the language of the pleading, if Jaime committed the offenses of possession of methamphetamine or cocaine while armed, he necessarily committed the lesser offenses of possession of methamphetamine or cocaine.

We turn, then, to consideration of whether the omission was prejudicial. As noted, the failure to instruct on a lesser included offense requires reversal if an examination of the entire record establishes a reasonable probability that the error affected the outcome. (*People v. Wyatt, supra*, 55 Cal.4th at p. 698; *People v. Beltran, supra,* 56 Cal.4th at p. 955.) Such a reasonable probability exists here. To prove count 3, the People were required to show, in addition to Jaime's possession of the methamphetamine or cocaine, that while possessing the contraband, he (1) had a loaded, operable firearm available for immediate offensive or defensive use; and (2) he knew that he had the firearm available for immediate offensive or defensive use. (CALCRIM No. 2303.) It was uncontroverted the gun was loaded and operable. However, the evidence that Jaime knew of its presence was weak at best. There was no direct evidence Jaime knew of the gun's presence. While he told police the drugs were his, he never mentioned the gun. It was undisputed that Teresa, not Jaime, owned the gun and had purchased it years before. The gun was registered to her, not to Jaime. It was found in a drawer containing Teresa's benefits card. In contrast, nothing linked Jaime to the gun. While there was evidence both Jaime and Teresa used the dresser, there was no evidence Jaime's possessions were in the drawer where the gun was found. There was no evidence Jaime used, or ever looked in, that particular drawer. No drugs were found in the dresser or the bedroom. The jury rejected the theory that Jaime and Teresa jointly possessed the drugs, as demonstrated by its acquittal of Teresa on the charges of possession of cocaine and methamphetamine for sale, and possession of a controlled substance with a firearm. Given the evidence, it is reasonably probable that a properly instructed jury would have convicted Jaime, on count 3, of only the lesser offense of simple possession of the drugs rather than possession of a controlled substance with a firearm. Accordingly, we reverse Jaime's conviction on count 3, possession of a controlled substance with a firearm in violation of Health and Safety Code section 11370.1, subdivision (a).

c. *Failure to instruct on the meaning of "keeping fighting birds"*

Teresa, joined by Jaime, argues that the trial court's instructions on count 5, possession of a bird for fighting, were inadequate. We disagree.

21

Whether a jury instruction is correct and adequate is a question of law, which we review de novo. (*People v. Jandres* (2014) 226 Cal.App.4th 340, 358.)

Section 597j, subdivision (a), provides in pertinent part: "Any person who owns, possesses, keeps, or trains any bird or other animal with the intent that it be used or engaged by himself or herself, by his or her vendee, or by any other person in an exhibition of fighting as described in Section 597b is guilty of a misdemeanor . . . ."

The trial court's special instruction on count 5 tracked the language of the statute. It stated: "Defendants are charged in Count FIVE with possession of fighting birds in violation of Penal Code [section] 597j(a), a misdemeanor. [¶] To prove that a defendant is guilty of this crime, the People must prove that: [¶] The defendant owned, possessed, kept, or trained any bird or other animal with the intent that it be used or engaged by himself or herself, by his or her vendee, or by any other person in an exhibition of fighting."

Appellants urge this instruction was inadequate because it did not further define the word "kept." They contend that this omission "would have encouraged the jury to convict appellant[s] on the basis of the fact that a tenant, Jesus Ochoa, rented space in which he possessed the birds, even if the jury did not believe that appellant[s] possessed the birds or did anything to care for them." In appellants' view, the instruction suggested a "person who merely allowed a tenant to raise roosters on her property, but never provided any care for the roosters and did not legally possess them," could nonetheless be found guilty.[10]

The People counter that appellants have forfeited this claim because they failed to request amplifying or clarifying language in the trial court, and in any event the word "keeping" is commonly understood.

---

[10] Appellants note in passing that the trial court did not instruct that a landlord does not possess the property of a tenant. We do not understand appellants to claim this omission was error, and therefore do not consider the point.

We agree with the People on both points. In the absence of a request for amplification, the language of a statute defining a crime is usually an appropriate and desirable basis for an instruction, as long as the jury would not have difficulty understanding the statute. (*People v. Palmer* (2005) 133 Cal.App.4th 1141, 1156; *People v. Santana* (2013) 56 Cal.4th 999, 1007 ["a jury instruction should typically track the language of a statute when feasible under the circumstances"]; *People v. Roldan* (2005) 35 Cal.4th 646, 740, disapproved on another ground in *People v. Doolin, supra,* 45 Cal.4th at p. 421, fn. 22.) " 'If a statutory word or phrase is commonly understood and is not used in a technical sense, the court need not give any sua sponte instruction as to its meaning.' " (*People v. Lucas* (2014) 60 Cal.4th 153, 296; *People v. Griffin* (2004) 33 Cal.4th 1015, 1022-1023; *People v. Rodriguez* (2002) 28 Cal.4th 543, 546-547.) A court does have a duty to define terms that have a technical meaning peculiar to the law. (*People v. Hoyos* (2007) 41 Cal.4th 872, 915, disapproved on other grounds in *People v. Black* (2014) 58 Cal.4th 912, 919-920.) A word has a technical legal meaning requiring clarification by the court when its definition differs from its nonlegal meaning. (*People v. Cross* (2008) 45 Cal.4th 58, 68.)

Appellants contend that "keep," as used in section 597j, means caring for an animal. They rely on section 597.1, subdivision (a)(1). That statute states, in pertinent part: "Every owner, driver, or keeper of any animal who permits the animal to be in any building, enclosure, lane, street, square, or lot of any city, county, city and county, or judicial district *without proper care and attention* is guilty of a misdemeanor. Any peace officer, humane society officer, or animal control officer shall take possession of the stray or abandoned animal and shall provide care and treatment for the animal until the animal is deemed to be in suitable condition to be returned to the owner." (Italics added.) From section 597.1's use of the word "keeper," appellants extrapolate that "keep" must mean to provide some degree of care for an animal.

We do not necessarily agree that section 597.1 sets forth the proper definition of "keep" as that term is used in section 597j. However, we do not disagree that "keep" includes the concept of caring for or maintaining an animal. Section 597j appears to use

23

the word in that commonly understood sense. The dictionary definition of "keep" includes "preserve, maintain," "watch over," "take care of," and "support." (Merriam Webster Online Dict. *<http://www.merriam-webster.com/dictionary/keep>* [as of April 2, 2015].) "Keeping" includes "the act of one that keeps," and "custody, maintenance." (Merriam Webster Online Dict., *supra, http://www.merriam-webster.com/dictionary/keeping>* [as of April 2, 2015].) The jury was instructed to use the ordinary, everyday meanings of words not specifically defined in the instructions. (CALCRIM No. 200.) While the dictionary lists a wide variety of meanings and usages for the word "keep,"[11] on the facts of this case the jury would naturally have understood "keep" to mean the foregoing.

Appellants contend that " "keep' " is often colloquially used to mean " 'allowing to remain.' " They point out that the dictionary definitions of "keep" include "to continue having or holding (something)," to not return, lose, sell, give away, or throw away; or to cause something to continue in a specified state, condition or position. Therefore, they urge, jurors likely concluded appellants "kept" a tenant and his roosters on the property, and were guilty because they allowed the tenant and roosters to remain.

We do not think reasonable jurors would have applied the instruction as suggested. First, the dictionary definitions cited by appellants do not suggest that "keep" means

---

[11]     Other uses of the word listed in the dictionary include, for example:  to be faithful to (keep a promise); to act fittingly in relation to (keep the Sabbath); to conform to in habits or conduct (keep late hours); to stay in accord with (keep time); to cause to remain in a given place, situation, or condition (keep him waiting); to preserve (food) in an unspoiled condition; to maintain a record (keep a diary); to have or maintain in an established position or relationship (keep a mistress); to detain (keep children after school); to reserve (keep some for later); to refrain from revealing (keep a secret); to retain in one's possession or power (kept the money); to stay or continue in (keep your seat); to stay against opposition (kept her ground); to have in control (keep your tempter); to confine oneself (keep my room); and to continue without interruption (keep talking). (Merriam Webster Online Dict., *supra, <http://www.merriam-webster.com/dictionary/keep*.)  As a matter of common sense, reasonable jurors would have understood that none of these uses of the word applied.

passively "allowing to remain." While Webster's includes "cause to remain" and "restrain from departure" as possible definitions, these are simply not synonymous with the type of passive conduct appellants suggest. Second, to determine whether a jury instruction is ambiguous, we inquire whether there is a reasonable likelihood jurors misunderstood and misapplied it. We consider the instructions as a whole, as well as the entire record of trial, including the arguments of counsel. (*People v. Cross, supra,* 45 Cal.4th at pp. 67-68; *People v. Young* (2005) 34 Cal.4th 1149, 1202; *People v. McPheeters* (2013) 218 Cal.App.4th 124, 132.) Here, the prosecutor did not argue, implicitly or explicitly, that appellants were guilty simply because they failed to evict a tenant who possessed the birds. Jaime's counsel pointed out that "somebody else came and took care of those roosters," and Teresa's counsel urged that once the property was rented, the back area leased to Ochoa would have been "off limits" to Teresa. Nothing in the parties' arguments would have created the impression that the jury could return a guilty verdict if appellants had no involvement with the roosters, except to allow Ochoa to keep them. (See generally *People v. Rogers* (2006) 39 Cal.4th 826, 869-870.)

In sum, because the instruction was adequate, the trial court had no sua sponte obligation to further define "keep." (*People v. Palmer, supra,* 133 Cal.App.4th at p. 1156.) Because the instruction was adequate as given, the instruction did not affect appellants' substantial rights (§ 1259), and their contentions have been forfeited. (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1347-1348; *People v. Palmer, supra,* at p. 1156.)

d. *Failure to instruct on the statute of limitations*

As originally prepared by the trial court or parties, CALCRIM Nos. 2511, relating to possession of a firearm by a felon, and 2591, relating to possession of ammunition, stated the first element as "the defendant possessed a firearm" and "the defendant possessed . . . ammunition." Just prior to the People's closing argument, the prosecutor requested that the trial court change the language in each instruction to "owned, purchased, received or possessed" the firearm or ammunition, and the court did so. The

court allowed counsel for Teresa to reopen her closing argument to address the modifications.

Teresa argues that given the amendment, the trial court was obliged to sua sponte instruct that the statute of limitations on count 6, possession of a firearm by a felon, was three years. (See § 801 [prosecution for an offense punishable by imprisonment in the state prison or pursuant to subdivision (h) of [s]ection 1170 shall be commenced within three years after commission of the offense].) She argues that absent an instruction on the limitations period, the jury was improperly allowed to convict her of possession of a firearm by a felon based on the 2005 purchase, in derogation of her jury trial and due process rights.[12]

We agree there was instructional error, but we reach that conclusion via a somewhat different analytical path than that Teresa suggests. It was undisputed Teresa purchased the gun in 2005. There was no evidence that she purchased any other firearm at another time. She was not charged with possession of a firearm by a felon until 2012. Thus, prosecution based *on the purchase* would have been time-barred as a matter of law. Moreover, the information charged Teresa with possession of a firearm by a felon occurring in 2012, not 2005. Therefore, the "purchased" language was unsupported by any evidence and was erroneously added.

However, on the facts of this case, the error was manifestly harmless. At trial, the prosecutor elicited evidence about the 2005 purchase not as the substantive basis for the

---

**12**      The People contend Teresa's contention has been forfeited because she failed to request an instruction on the statute of limitations below. However, a trial court has a sua sponte duty to properly instruct the jury on the general principles of law relevant to the evidence. (*People v. Moye* (2009) 47 Cal.4th 537, 548; *People v. Haraszewski* (2012) 203 Cal.App.4th 924, 936.) Accordingly, there is no forfeiture. To the extent Teresa argues a further instruction was required, affirmatively advising the jury that the 2005 purchase could not support a finding of guilt, such an instruction was a "pinpoint" instruction that the trial court was under no duty to give sua sponte. (See generally *People v. Gutierrez* (2009) 45 Cal.4th 789, 824.) Because we conclude that the instructions given were harmless error, we do not reach Teresa's contention that her counsel provided ineffective assistance by failing to request such an instruction.

conviction, but to prove that the gun found in Teresa's dresser *in 2012* was hers. The parties' arguments made this clear. Even before the jury instructions were modified, defense counsel argued in closing, "remember, you're not being asked whether [Teresa is] guilty of possessing a firearm in 1995 [*sic*] while having a felony conviction. You are being asked if on or about March 1, 2012, did Mrs. Morales possess this firearm." After the instruction was amended, defense counsel reiterated that Teresa had been charged with possession of a firearm occurring on March 1, 2012, and "the question for you now is at the time of this occurrence . . . did Mrs. Morales own, possess, purchase, have the firearm and ammunition?" During the People's closing argument, after the instruction had been modified, the prosecutor argued: "Teresa Morales purchased a gun back in 2005. She was the registered owner of the gun. The registration for the owner of the gun never changed. On the date this search took place in the house, she was the owner of the gun. She was also in possession of the gun. This gun was found in her bedroom, in her home. She not only owned it, she was in possession of it." As we have observed *ante*, when determining whether there is a reasonable likelihood jurors misunderstood or misapplied an instruction, the arguments of counsel are relevant. (*People v. McPheeters, supra*, 218 Cal.App.4th at p. 132.) Here, the arguments of counsel made clear Teresa could only be convicted if she possessed the gun on March 1, 2012.

The elements of possession of a firearm by a felon are conviction of a felony and ownership or knowing possession, custody, or control of a firearm. (*People v. Osuna* (2014) 225 Cal.App.4th 1020, 1029.) " 'A defendant possesses a weapon when it is under his dominion and control. [Citation.] A defendant has actual possession when the weapon is in his immediate possession or control. He has constructive possession when the weapon, while not in his actual possession, is nonetheless under his dominion and control, either directly or through others. [Citations.]' " (*Id.* at p. 1029.) It was undisputed Teresa, a felon, purchased the gun in 2005. The evidence showed the very same gun was found in her bedroom, in her dresser drawer, along with her medical card, during the 2012 search. There was uncontroverted testimony that Teresa told Officer Jimenez the gun was hers on the date of the 2012 search. The evidence of guilt was thus

27

overwhelming. The defense argument—that by 2012 the gun might have been in Jaime's control, and Teresa might have been unaware of its presence—was weak and speculative. Given the record, the instructional error was harmless under any standard. (See *People v. Palmer, supra,* 133 Cal.App.4th at pp. 1157-1158; *Chapman v. California* (1967) 386 U.S. 18; *People v. Watson, supra,* 46 Cal.2d 818.)

Contrary to Teresa's contention, the failure to instruct on the statute of limitations did not constitute *Apprendi* error. (*Apprendi v. New Jersey* (2000) 530 U.S. 466.) Teresa argues that because, under *Apprendi*, any fact that increases a defendant's punishment beyond the prescribed statutory maximum must be found to be true by a jury beyond a reasonable doubt, the question of whether the statute of limitations barred prosecution for the 2005 purchase should have been submitted to the jury. But as we have explained, Teresa was not prosecuted for the 2005 gun purchase. She was prosecuted for the 2012 possession. It is clear beyond a reasonable doubt the jury did not use the 2005 purchase as the basis for the conviction.

e. *Response to jurors' question regarding unanimity*

(i) *Additional facts and contentions*

During deliberations, the jury sent the following question to the trial court: "If voting not guilty, does it have to be unanimous?" The trial court provided jurors with the following written response: "The answer is: Yes. Refer to jury instruction number 3550 on page 15."

CALCRIM No. 3550, as given to the jury, provided in pertinent part: "It is your duty to talk with one another and to deliberate in the jury room. *You should try to agree on a verdict if you can. Each of you must decide the case for yourself*, but only after you have discussed the evidence with the other jurors. Do not hesitate to change your mind if you become convinced that you are wrong. But *do not change your mind just because other jurors disagree with you*. [¶] . . . [¶] Your verdict on each count and any special findings must be unanimous. This means that, to return a verdict, all of you must agree to it. . . . [¶] You will be given verdict forms. As soon as all jurors have agreed on a verdict, the foreperson must date and sign the appropriate verdict forms and notify the

28

bailiff. *If you are able to reach a unanimous decision on only one or only some of the charges or defendants, fill in those verdict forms only, and notify the bailiff. Return any unsigned verdict form.*" (Italics added.)

Teresa, joined by Jaime, contends that the trial court's response coerced the jurors into reaching their verdicts and placed pressure on potential "hold-out" jurors who were inclined to acquit, thereby infringing appellants' rights to due process and a jury trial. Appellants urge that the trial court should simply have answered, "No," because jurors always have the power to vote not guilty.

(ii) *Forfeiture*

At the close of the case, counsel for Teresa advised the court that because she was required to appear in a matter in a different location, she had agreed that counsel for Jaime could stand in for her in connection with questions arising during deliberations. When the jury posed the question at issue, Jaime's counsel stated, on behalf of both defendants, that she agreed with the trial court's response. In light of counsel's agreement, the People contend appellants have forfeited their claims. The People are correct. (See *People v. Dykes* (2009) 46 Cal.4th 731, 798-799, 802; *People v. Marks* (2003) 31 Cal.4th 197, 237.)

Appellants counter that the purported error implicates their substantial rights (§ 1259), and, if the failure to object resulted in forfeiture, counsel provided ineffective assistance. Accordingly, we address the question of whether the trial court's response was erroneous. (See *People v. Wallace* (2008) 44 Cal.4th 1032, 1074, fn. 7; *People v. Loza* (2012) 207 Cal.App.4th 332, 357-358.)

(iii) *Discussion*

We apply the abuse of discretion standard to any decision by a trial court to instruct, or not instruct, in its exercise of its supervision over a deliberating jury. (*People v. Waidla* (2000) 22 Cal.4th 690, 745-746.) We independently determine whether the instructions given were correct and adequate. (*People v. Riley* (2010) 185 Cal.App.4th 754, 767; *People v. Mathson* (2012) 210 Cal.App.4th 1297, 1311.)

29

Appellants have failed to establish ineffective assistance here because the trial court's response to the jury's question was not objectionable. When a deliberating jury requests clarification of an instruction, section 1138 requires that the court provide information the jury desires on points of law, and attempt to " 'clear up any instructional confusion.' " (*People v. Giardino* (2000) 82 Cal.App.4th 454, 465; *People v. Hodges* (2013) 213 Cal.App.4th 531, 539; *People v. Montero* (2007) 155 Cal.App.4th 1170, 1179; *People v. Solis* (2001) 90 Cal.App.4th 1002, 1015.) " 'This does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. [Citation.] Indeed, comments diverging from the standard are often risky. [Citation.]" [Citation.]' " (*Montero*, at p. 1179; *Solis*, at p. 1015.) The trial court must consider how it can best aid the jury and " 'whether further explanation is desirable, or whether it should merely reiterate the instructions already given.' " (*Giardino*, at p. 465.)

The trial court did not err by telling jurors the verdict must be unanimous: that is a correct statement of law. (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 569 ["In California, a jury verdict in a criminal case must be unanimous"].) Indeed, Teresa's counsel told jurors the same thing during closing argument. Nor did the court err by referring the jury back to CALCRIM No. 3550. That instruction is also a correct statement of law. (*People v. Santiago* (2009) 178 Cal.App.4th 1471, 1475-1476.)

Contrary to appellants' claim, the court's response would not have suggested to jurors that a deadlock was impermissible, nor would it have pressured potential holdout jurors. The court's answer was not directed at a hung jury; there was no indication of a holdout juror or jurors, or a potential deadlock. CALCRIM No. 3550 does not contain the flaws that have typified coercive instructions in other cases. As explained in *Santiago*, CALCRIM No. 3550 "does not improperly direct minority jurors to give way to majority jurors or improperly tell the jury that all criminal cases must be decided at some point." (*People v. Santiago, supra,* 178 Cal.App.4th at p. 1473.) Nor did the instruction suggest that minority jurors—if, indeed, there were any—should rethink their

30

position in light of the majority's views, reference the expense and inconvenience of a retrial, or encourage jurors to consider the numerical division or preponderance of opinion of the jury in forming or reexamining their views.  (See generally *People v. Valdez* (2012) 55 Cal.4th 82, 163-164.)  The instruction "does not improperly direct a deadlocked jury that it is required to reach a verdict.  It does not place any constraints on an individual juror's responsibility to consider and weigh the evidence.  It does not coerce the jurors into abdicating their independent judgment to majority jurors for expediency."  (*Santiago*, at p. 1476.)

To the contrary, much of the language in CALCRIM No. 3550, italicized *ante,* telegraphs to a jury that it is *not* required to reach a verdict.  The statements that "You should try to agree on a verdict if you can" and "If you are able to reach a unanimous decision on only one or only some of the charges or defendants, fill in those verdict forms only, and notify the bailiff" make clear that a verdict is not required.

Appellants contend that the trial court's response was coercive because, by telling jurors unanimity was required when " 'voting not guilty,' " the instruction focused "solely on those jurors who found the defense plausible and ignor[ed] the jurors who were inclined to convict," thereby "encourag[ing] pro-defense jurors to abandon their positions."  We disagree.  *The jury's question* was whether "[i]f voting not guilty, does it have to be unanimous?"  The court's one word response—"Yes"—simply answered that query; the jury would not have understood the court's answer to single out those jurors inclined to acquit.  The court's response cannot reasonably be construed to have put pressure on any juror to abandon his or her position, as appellants contend.  Nor did the court's response convey that it was the "particular burden" of jurors inclined to acquit to "achieve unanimity."

Appellants' citation to the Ninth Circuit case of *Jiminez v. Myers* (9th Cir. 1993) 40 F.3d 976, is unavailing.  In *Jiminez,* the jury twice reported to the court that it was deadlocked.  The court inquired on both occasions as to the numeric breakdown of the votes, and asked whether there had been "movement" one way or the other.  (*Id.* at pp. 978-979.)  Upon learning that a single holdout juror remained, the court sent the jury

back to continue deliberations. A divided Ninth Circuit panel held that the trial court's conduct was coercive. (*Id.* at p. 981.) Nothing of the sort occurred here.

Because the trial court's response was not objectionable, defense counsel did not perform below an objective standard of reasonableness by failing to object. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Brown* (2014) 59 Cal.4th 86, 109; *People v. Mai* (2013) 57 Cal.4th 986, 1009.) Thus, appellants have failed to establish either instructional error or ineffective assistance of counsel.[13]

---

**13** In light of our conclusion that no error occurred, we need not reach the parties' arguments regarding prejudice.

## DISPOSITION

Appellant Jaime Morales's conviction on count 3, possession of a controlled substance with a firearm (Health & Saf. Code, § 11370.1) is reversed, and the matter is remanded for further proceedings consistent with this opinion.  In all other respects, the judgments are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ALDRICH, J.

We concur:

EDMON, P. J.

LAVIN, J.[*]

---

[*]    Judge of the Superior Court of Los Angeles County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.