Filed 11/5/12

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S189786 |
| v. | ) | |
| | ) | Ct.App. 1/2 A114612 |
| REGINALD WYATT, | ) | |
| | ) | Alameda County |
| Defendant and Appellant. | ) | Super. Ct. No. C147107 |
| _____ | ) | |

While in defendant's care, defendant's young son died of shock and hemorrhage due to blunt force trauma. A jury convicted defendant of involuntary manslaughter (Pen. Code,[1] § 192, subd. (b)) and assault on a child causing death (§ 273ab). As relevant here, the Court of Appeal reversed the section 273ab conviction upon finding the trial court erroneously failed to instruct the jury, sua sponte, on simple assault as a lesser included offense. We conclude there was no error. We therefore reverse the judgment of the Court of Appeal and remand with directions to reinstate the conviction.

## FACTUAL AND PROCEDURAL BACKGROUND

In May 2003, defendant Reginald Wyatt was living with Tiffany Blake and their infant daughter, Valerie. Defendant also had a 14-month-old son, Reginald Wyatt, Jr. (Reginald), from a previous relationship. On the morning of May 18,

_____

[1] All further statutory references are to this code unless otherwise indicated.

1

2003, Reginald stopped breathing while in defendant's care. He was rushed to the hospital, but could not be revived. Although the treating doctor saw no signs of significant injury on the body, the autopsy disclosed that Reginald died of shock and hemorrhage due to blunt force trauma to the chest and abdomen.

An information was filed charging defendant with one count of murder (§ 187, subd. (a)) and one count of assault on a child causing death (§ 273ab).[2]

As explained in detail, *post*, the evidence at trial included medical evidence concerning Reginald's injuries, defendant's tape-recorded statements and trial testimony, and testimony from Tiffany Blake and Reginald's mother. After the defense rested, the court granted a judgment of acquittal as to the murder count. (§ 1118.1.) The jury convicted defendant of involuntary manslaughter (§ 192, subd. (b)) and child assault homicide (§ 273ab).

In 2008, the Court of Appeal reversed the section 273ab conviction. Because the evidence did not show that defendant had " '*actual* knowledge' he was 'wrestling far too hard with his young son,' " the court deemed the evidence insufficient to prove the requisite mens rea for the crime. (*Wyatt I*, *supra*, 48 Cal.4th at p. 779.) On review of the matter, we explained that under *People v. Williams* (2001) 26 Cal.4th 779 (*Williams*), "a defendant may commit an assault without realizing he is harming the victim, but the prosecution must prove the defendant was aware of facts that would lead a reasonable person to realize that a battery would directly, naturally, and probably result from the defendant's

---

[2] The assault provision now appears in section 273ab, subdivision (a), without substantive change. (Compare Stats. 1996, ch. 460, § 2, p. 2814 with Stats. 2010, ch. 300, § 1.) We refer to the operative statute simply as section 273ab. In *People v. Wyatt* (2010) 48 Cal.4th 776 (*Wyatt I*), we noted the offense defined by section 273ab was sometimes referred to as "child abuse homicide." (*Wyatt I*, at p. 779.) Upon reflection, we agree with defendant that "child assault homicide" is a more accurate term for the offense.

conduct." (*Wyatt I*, at p. 779.)  Applying the *Williams* standard, we found substantial evidence establishing "that defendant knew he was striking his young son with his fist, forearm, knee, and elbow, and that he used an amount of force a reasonable person would realize was likely to result in great bodily injury."  (*Ibid.*)  Accordingly, we reversed the judgment of the Court of Appeal and remanded for further proceedings.

The Court of Appeal again reversed the section 273ab conviction, this time concluding the trial court should have instructed the jury, sua sponte, on simple assault as a lesser included offense.

We granted the People's petition for review.

### DISCUSSION

The Court of Appeal relied on *People v. Basuta* (2001) 94 Cal.App.4th 370 for the proposition that simple assault (§ 240) is a lesser included offense of child assault homicide (§ 273ab).  The People do not contest this holding, so we proceed to the inquiry at hand.  Given the evidence at trial, did the trial court prejudicially err in failing to instruct the jury sua sponte on simple assault?

The legal principles governing our analysis are settled.  "In criminal cases, even absent a request, a trial court must instruct on the general principles of law relevant to the issues the evidence raises.  [Citation.]  ' "That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged.  [Citations.]" '  [Citation.]  '[T]he existence of "*any* evidence, no matter how weak" will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury.  [Citations.]' "  (*People v. Taylor* (2010) 48 Cal.4th 574, 623; see *People v.*

*Thomas* (2012) 53 Cal.4th 771, 813; *People v. Huggins* (2006) 38 Cal.4th 175, 215.) In this regard, the testimony of a single witness, including that of a defendant, may suffice to require lesser included offense instructions. (*People v. Lewis* (2001) 25 Cal.4th 610, 646.) Courts must assess sufficiency of the evidence without evaluating the credibility of witnesses, for that is a task reserved for the jury. (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) The failure to instruct on a lesser included offense in a noncapital case does not require reversal "unless an examination of the entire record establishes a reasonable probability that the error affected the outcome." (*Breverman*, at p. 165; see *Thomas*, at p. 814.)

We begin with a summary of the prosecution's evidence.[3] At the time of the crimes, Reginald was 14 months old, stood 31 inches tall, and weighed 26 pounds. (*Wyatt I*, *supra*, 48 Cal.4th at pp. 782, 783.) After the autopsy, defendant waived his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 and gave the following statements to investigators in a tape-recorded interview. On the morning of May 18, 2003, defendant got up and started wrestling and playing with Reginald, who was staying with him and his girlfriend Tiffany Blake for the weekend. Defendant picked Reginald up and threw him on the bed, and "chopped" his back with both hands. He held Reginald up and pressed the boy's stomach to his head, and then turned and flipped Reginald a distance of about four feet onto the bed. (*Wyatt I*, at p. 782.)

Defendant said that at one point, he accidentally fell on top of Reginald while performing a move he called "comin' off the top rope." Defendant explained that Reginald rolled unexpectedly just as defendant was about to jump

---

[3]    We draw heavily from the facts as recited in *Wyatt I*, *supra*, 48 Cal.4th at pages 782-784, and incorporate additional facts from the record where relevant to the analysis.

on the bed. When defendant landed, his hip came down on Reginald, along with most or all of defendant's body weight of 170 pounds. Reginald grunted as if the wind had been knocked out of him, but he did not cry and continued to smile and seemed fine. Blake later told defendant he was playing too rough with Reginald and could hurt him, so defendant stopped. (*Wyatt I*, *supra*, 48 Cal.4th at p. 782.)

After Blake left for work, defendant resumed wrestling with Reginald for another 20 or 30 minutes. During this period, defendant might have hit his son harder because Blake was not there to interfere. Defendant "body slammed" Reginald about four times, and used his fists to hit Reginald in the chest about 10 or 11 times. He did an "atomic elbow" to Reginald's head, hit him in the upper chest with his forearm about three times, and then hit him on the back. In addition, defendant held Reginald up by his neck, squeezed him between his legs, and twice did a "knee drop," in which he hit Reginald in the back with his knee. He also did "pretend" head butts and boxed with Reginald, and repeatedly did a "suplex," which involved grabbing Reginald and flipping him over defendant's body onto the bed. Defendant said he wanted his son to be more "active" and was trying to "toughen him up" because a kid cannot be "soft" to grow up in Oakland. (*Wyatt I*, *supra*, 48 Cal.4th at p. 783.)

During a second tape-recorded interview that same evening, the investigators asked defendant what he was feeling when wrestling with Reginald. Defendant said he was not feeling like himself or thinking about being rough, then clarified he was "stuck" on play-fighting with his son: "Like I just had a one-track mind. I was just stuck on toughening him up, playin' with Reggie, beatin' up Reggie . . . that's all that was stuck on there." He further stated, "[M]y mind musta went blank, though, for me to really . . . hit him hard enough . . . to hurt him, and I not notice it. I wasn't payin' attention, and I wasn't thinkin'." In defendant's words, "I was hittin' him pretty hard" and "I wasn't doin' nothin' to

5

not hit him no harder." As for why he did not heed Blake's warning about hurting Reginald, defendant admitted he was "[h]ard-headed" and "[s]tubborn" and "[d]idn't want a woman to be tellin' me how to raise my son." Although he had play-wrestled with Reginald before, this was the first time he "lost control." (*Wyatt I*, *supra*, 48 Cal.4th at p. 783.)

Prosecution witness Dr. David Levin testified his external examination disclosed an abrasion on Reginald's chin and two abrasions on the neck. There was a laceration of the frenulum of the upper lip and a contusion on the chest. During his internal examination, Dr. Levin found an internal contusion under the scalp at the forehead, and bleeding on the surface of the heart, on the tissue behind the heart, and at the hilus of the left lung. There were four lacerations to the liver, which caused internal bleeding of 200 milliliters of blood into the abdominal cavity. Dr. Levin also found hemorrhaging behind the abdominal cavity and in the mesentery of the small and large intestines, as well as acute fractures of the fifth and sixth ribs on both the right and left sides of the back of the body. He additionally observed mild cerebral swelling. (*Wyatt I*, *supra*, 48 Cal.4th at pp. 783-784.)

Dr. Levin determined that Reginald died of shock and hemorrhage due to blunt force trauma to the chest and abdomen. The injuries were consistent with multiple instances of blunt force trauma to the back, abdomen, chest, and head, although some of the injuries could have been caused if a person who weighed 170 pounds jumped up and landed with his hip onto the child's midsection. The infliction of trauma would not necessarily result in external bruising, especially in softer areas like the abdomen. The contusion on the chest could have been caused by someone attempting to administer CPR, but it was highly unlikely CPR caused the fractured ribs in the back of the body. (*Wyatt I*, *supra*, 48 Cal.4th at p. 784.)

6

Dr. James Crawford testified as a pediatric expert in medical evaluations of child abuse. According to Dr. Crawford, Reginald's injuries were "at the end of the bell curve," meaning they were at a level uncommon for a one-year-old child. The types of injuries Reginald suffered, including the four lacerations to the liver and the multiple sites of internal bleeding, "are seen only in the most serious events," such as when children are in car crashes or hit by motor vehicles. The likelihood that Reginald's ribs were broken during CPR was "extraordinarily small." Although the fractures could conceivably have been caused by blunt force trauma to the child's back, it would have to have been "something that would have been quite violent, quite out of the ordinary," given how uncommon rib fractures are in children. Unless the child were unconscious or had a profound neurological condition, he would be expected to have reacted to the types of injuries shown here by crying and clearly demonstrating distress. Dr. Crawford found it unbelievable that a child with such injuries would be laughing and smiling. (*Wyatt I*, *supra*, 48 Cal.4th at p. 784.)

In Dr. Crawford's opinion, there had to have been "at least multiple, and potentially many impacts" for the identified injuries to have resulted. Although it was remotely possible that one extremely violent lateral compression could have caused all of the significant injuries, it was more likely the injuries were caused by more than one blow. If all the different injuries were caused by a single event, it would have to have been "an extraordinarily violent act." (*Wyatt I*, *supra*, 48 Cal.4th at p. 784.)

In his defense, defendant took the stand and denied performing any real wrestling moves on Reginald. He claimed he did not strike his son hard but used only "make-believe wrestling moves," such as "body-slam," "off-the-top-rope," "head butt," "suplex," and an "atomic elbow" to the head. Defendant testified that at one point, he intended to jump on the bed next to Reginald to make the bed

7

shake so Reginald would laugh. When defendant jumped up and was in the air, Reginald rolled underneath him. Defendant ended up falling on his son, with his hip hitting Reginald in the back. Defendant said that, after he landed on Reginald by accident, it appeared his son had the wind knocked out of him. Reginald did not cry and assumed normal breathing after a short while. Defendant testified he stopped playing with Reginald and put him down on his sleeping pallet with some milk. Defendant drifted off to sleep at about 10:00 a.m.

When defendant awoke, Reginald was not responsive but breathing faintly. He hit Reginald on the back and attempted CPR on him, but Reginald did not respond. Defendant tried calling his stepmother and Reginald's mother, but neither one answered. He then dialed 911, but could not get through. When he performed CPR on Reginald again, "some green stuff" came out of Reginald's nose. Defendant panicked and picked up his young daughter and Reginald to go to a neighbor's apartment. At this point, defendant tripped and dropped both children, with Reginald's head hitting the floor. The neighbor dialed 911. Defendant did not initially tell police about the bed-jumping incident because he did not connect it with Reginald's condition.

Defendant then explained his incriminating statements to the investigators. Defendant told the investigators he was wrestling with Reginald, presuming they realized that he meant he was "play wrestling." When the investigators asked how Reginald could have suffered such extensive injuries in a single accident, defendant began "second-guessing" himself and entertained the possibility that he did not remember the events correctly and that he hit Reginald harder than he believed. Defendant was grief stricken, and he felt shame and guilt about what had happened. Defendant's mind was spinning, and he "just kind of went along" with the investigators' hypothesis that he blacked out and struck Reginald too hard, "because they knew, you know, basically what happened."

8

Defense pathologist Dr. Paul Herrmann testified that Reginald's liver and rib injuries could have resulted from a single sharp blow to the back, such as if a 170-pound man had fallen on him, but he acknowledged that would be less likely if Reginald were on a bed instead of on the floor. Dr. Hermann also believed the injuries to Reginald's chest and heart area were likely due to CPR administration, and the cause of the tear to his frenulum was consistent with an endotracheal tube being placed in his mouth with violent force. On cross-examination, Dr. Herrmann testified that a child receiving severe injuries to the liver and ribs might scream in pain or go immediately into shock and become still. Either way, however, a caregiver would likely notice a difference in the child's behavior.

At the time of the crime, section 273ab provided in relevant part: "Any person who, having the care or custody of a child who is under eight years of age, assaults the child by means of force that to a reasonable person would be likely to produce great bodily injury, resulting in the child's death, shall be punished by imprisonment in the state prison for 25 years to life." (See *ante*, fn. 2.) As *Wyatt I* explained, the assault in this offense requires evidence that the defendant acted "with awareness of facts that would lead a reasonable person to realize that great bodily injury would directly, naturally, and probably result from his act." (*Wyatt I*, *supra*, 48 Cal.4th at p. 781; see *Williams*, *supra*, 26 Cal.4th at p. 788.) Consistent with its meaning in analogous statutory contexts, "great bodily injury" refers to "significant or substantial physical injury. It is an injury that is greater than minor or moderate harm." (CALCRIM No. 820 [listing elements of § 273ab]; see *People v. Maciel* (2003) 113 Cal.App.4th 679, 686; *People v. Albritton* (1998) 67 Cal.App.4th 647, 658.) Because the defendant "need not know or be subjectively aware that his act is capable of causing great bodily injury," the requisite mens rea may be established "even when the defendant honestly believes his act is not likely to result in such injury." (*Wyatt I*, at p. 781.)

9

Section 240 defines the crime of simple assault as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another."  Although assault does not require a specific intent to injure the victim, the defendant must "actually know[] those facts sufficient to establish that his act by its nature will probably and directly result in physical force being applied to another."  (*Williams*, *supra*, 26 Cal.4th at p. 788.)  No actual touching is necessary, but the defendant must do an act likely to result in a touching, however slight, of another in a harmful or offensive manner.  (See *People v. Cox* (2000) 23 Cal.4th 665, 674.)

As indicated, the obligation to instruct on a lesser included offense does not arise when there is no evidence that the offense was less than that charged.  (*People v. Thomas*, *supra*, 53 Cal.4th at p. 813; *People v. Taylor*, *supra*, 48 Cal.4th at p. 623.)  Thus, the question is whether substantial evidence supported a conclusion that defendant committed only simple assault and not child assault homicide.  The dispute here, reduced to its essence, concerns the measure of the force applied by defendant.

Defendant testified he jumped onto the bed to make it shake, so as to make Reginald laugh.  Reginald unexpectedly rolled underneath defendant as he was in the air, and defendant landed on Reginald.  Apart from that, defendant denied causing any harm to his son, and specifically denied striking Reginald hard or using real wrestling moves on him.  In support of defendant's case, Dr. Herrmann offered expert testimony that the blunt force trauma causing Reginald's death could have resulted from defendant's falling on Reginald.  The Court of Appeal found that the testimony of defendant and his expert, taken together, reflected substantial evidence of a simple assault.  We are not persuaded.

When compared, the prosecution's evidence (see *ante*, at pp. 4-7) and defendant's evidence presented the jury with two scenarios on the charge of child

10

assault homicide. The prosecution's evidence supported its theory that defendant was guilty of administering multiple blunt force blows to Reginald that caused massive internal trauma and resulted in his death. Conversely, defendant offered evidence to show he was not guilty of the charged crime because Reginald died as a result of a single unfortunate accident when the child unforeseeably rolled or turned as defendant jumped on the bed. After receiving instructions on child assault homicide and accident, the jury returned a verdict finding defendant guilty.

The Court of Appeal, however, held the jury's rejection of the accident theory did not foreclose the possibility that the jury might also have convicted defendant of simple assault rather than child assault homicide. In the court's view, the jury could have found, based on defendant's testimony he intended to jump on the bed *next to* Reginald but not *on* him, that defendant did not commit an act likely to produce great bodily injury, notwithstanding the serious injuries and death that in fact resulted. We cannot agree.

The Court of Appeal's theory of simple assault is predicated on the assumption that defendant willfully jumped on the bed in close proximity to Reginald. Significantly, a jury could not convict defendant of assault under this theory unless it found a reasonable person would realize this act would directly, naturally, and probably result in physical force being applied against Reginald. (*Williams*, *supra*, 26 Cal.4th at p. 790.) Here, the record established that defendant weighed 170 pounds and that Reginald, who was 14 months old, weighed only 26 pounds and stood 31 inches tall. According to defendant's testimony, Reginald was lying on the bed when defendant purposefully jumped up and onto the bed, intending to catch Reginald in the space between defendant's body and elbow (i.e., under defendant's armpit) upon landing. Despite defendant's claimed intent, given the obvious weight disparity between defendant and Reginald, Reginald's size and tender age, and the way in which defendant

11

jumped up and over Reginald in order to land in such close proximity to him, no reasonable person would conclude that defendant's act would probably result in only minor injury to Reginald.[4]

Nonetheless, even if a reasonable person might believe that minor or moderate harm was a possible outcome, the trial court is not required to "instruct sua sponte on the panoply of all *possible* lesser included offenses." (*People v. Huggins*, *supra*, 38 Cal.4th at p. 215, italics added.) Such instructions are required only when there is substantial evidence that, if the defendant is guilty at all, he is guilty of the lesser offense, but not the greater. (*Ibid.*; *People v. Thomas*, *supra*, 53 Cal.4th at p. 813.) " ' " 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed." ' [Citation.]" (*Huggins*, at p. 215.) Here, it would be speculative at best to construe the trial evidence in this case as supporting a verdict of only simple assault. (See *People v. Mendoza* (2000) 24 Cal.4th 130, 174.) Accordingly, the trial court had no sua sponte duty to instruct on that lesser offense. (See *People v. Berry* (1976) 18 Cal.3d 509, 519 [court may refuse to instruct on simple assault where evidence makes clear that if the defendant is guilty at all, he is guilty of the greater offense of assault by means of force likely to produce great bodily injury]; *People v. McCoy* (1944) 25 Cal.2d 177, 187.)

---

[4]    Dr. Herrmann's testimony did not provide substantial evidence to the contrary. The defense utilized Dr. Herrmann to address the medical possibility that defendant's landing on Reginald caused the fatal injuries, and he opined it was equally probable that the fatal injuries could have been caused "by a single blow, as by multiple blows." The doctor, however, offered no opinion that only minor or moderate harm would probably result from the claimed assaultive act.

## DISPOSITION

We reverse the judgment of the Court of Appeal and remand the matter with directions to reinstate defendant's section 273ab conviction.

**BAXTER, J.**


**WE CONCUR:**

CANTIL-SAKAUYE, C.J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

**CONCURRING OPINION BY KENNARD, J.**

This case is before us the second time.  To explain why I am writing separately, some background information may be helpful.

In the earlier decision, *People v. Wyatt* (2010) 48 Cal.4th 776 (*Wyatt I*), the issue involved the sufficiency of the evidence supporting defendant's conviction for assault on a child resulting in death (hereafter also referred to as child abuse homicide), a crime set forth in Penal Code section 273ab.  That statute states: "Any person, having the care or custody of a child who is under eight years of age, who *assaults* the child by means of force that to a reasonable person would be likely to produce great bodily injury, resulting in the child's death, shall be punished by imprisonment . . . for 25 years to life."  (*Id.*, subd. (a), italics added.)  In concluding that, contrary to the Court of Appeal's decision, the evidence against defendant met Penal Code section 273ab's requirements, *Wyatt I* relied on the definition of assault that a majority of this court had adopted in *People v. Williams* (2001) 26 Cal.4th 779 (*Williams*).  (*Wyatt I*, *supra*, at pp. 780-781.)

*Williams* described the mental state for assault as requiring only that the defendant have "actual knowledge of the facts sufficient to establish that the defendant's act by its nature will probably and directly result in injury to another" (*Williams*, *supra*, 26 Cal.4th at p. 782), and as *not* requiring "a specific intent to cause injury" (*id.* at p. 790).  I dissented, expressing the view that assault is a specific intent crime that requires proof of an intent to injure another.  (*Id.* at

1

p. 791 (dis. opn. of Kennard, J.); see also *People v. Colantuono* (1994) 7 Cal.4th 206, 225-228 (conc. & dis. opn. of Kennard, J.); *Wyatt I*, *supra*, 48 Cal.4th at p. 786 (conc. opn. of Kennard, J.).)  Because the *Williams* majority's view of the requisite mental state for assault carried the force of precedent, I concurred in *Wyatt I* in upholding defendant's child abuse homicide conviction and in reversing the Court of Appeal's judgment.  (*Wyatt I*, *supra*, at p. 787.)

In the wake of the remand to the Court of Appeal in *Wyatt I*, that court again reversed defendant's conviction, this time on the ground that the trial court erred in not instructing the jury on its own initiative on simple assault, a lesser offense necessarily included in the crime of assault on a child resulting in death. The trial court's duty in this regard arises only if a reasonable jury could have concluded that the lesser offense was committed, but not the greater offense.  (See maj. opn., *ante*, at pp. 3-4, 12.)  As it did in *Wyatt I*, the majority here relies on the *Williams* definition of simple assault (*id.* at p. 10), and it then holds that the evidence would not have supported such a conclusion (*id.* at p. 11).  Because, as I observed earlier, the *Williams* majority's definition of assault is now the law, I concur in today's majority opinion.


KENNARD, J.


2

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Wyatt

_____

**Unpublished Opinion** XXX NP opn. filed 12/9/10 – 1st Dist., Div. 2
**Original Appeal**
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S189786
**Date Filed:** November 5, 2012

_____

**Court:** Superior
**County:** Alameda
**Judge:** Jon Rolefson

_____

**Counsel:**

Waldemar D. Halka, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Stan Helfman, Laurence K. Sullivan, Violet M. Lee and Alisha M. Carlile, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Waldemar D. Halka
P.O. Box 99965
San Diego, CA  92169
(858) 273-8626

Alisha M. Carlile
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-5896