Filed 2/1/21  P. v. Bennett CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SERGIO WAYNE BENNETT,<br><br>    Defendant and Appellant. | B300986<br><br>Los Angeles County<br>Super. Ct. No. YA095235-04 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Laura C. Ellison, Judge.  Affirmed.

Michael C. Sampson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, David E. Madeo and Peggy Z. Huang, Deputy Attorneys General, for Plaintiff and Respondent.

―――――――――――

A jury convicted Sergio Wayne Bennett of conspiracy to commit assault by means of force likely to cause great bodily injury, and false imprisonment by violence.  He appeals, and we affirm.

## BACKGROUND

An amended information charged Bennett with conspiracy to commit assault by means of force likely to produce great bodily injury (Pen. Code,[1] §§ 182, subd. (a)(1), 245 subd. (a)(4), count 1); first degree burglary (§ 459, count 2); assault with a deadly weapon (razor blade) (§ 245, subd. (a)(1), count 3), with an allegation of personal infliction of great bodily injury (§§ 667.5, subd. (c)(8), 1192.7, subd. (c)(8), 12022.7, subd. (a)); assault with a firearm (§ 245, subd. (a)(2), count 4); first degree residential robbery (§ 211, count 5); false imprisonment by violence (§ 236, count 6); and criminal threats (§ 422, subd. (a), count 7), with an allegation on counts 5-7 of personal use of a deadly weapon (razor blade) (§§ 1192.7, subd. (c)(23), 12022, subd. (b)(1)). (We omit other charges against Bennett's codefendants, Tonia Jennifer Gray and Adrian Dominguez, who pleaded no contest and are not parties to this appeal.)  The information also alleged Bennett had a prior strike conviction (§§ 667, subds. (b)-(j), 1170.12) and a prior serious felony conviction (§ 667, subd. (a)(1)), and had served two prior prison terms (§ 667.5, subd. (b)). Bennett admitted the prior conviction allegations.

1.  *Prosecution evidence*

Andrew McDaris testified that in 2015, his good friend Gray asked if her 18-year-old son Victor could move in with him, because Victor was fighting with her husband.  She paid McDaris

---

[1]     All the statutory references that follow are to the Penal Code.

$1,200 for four months' rent. At first McDaris got along with Victor. But two weeks in Victor stole some things that had belonged to McDaris's grandfather, and then one day McDaris came home to find Victor locked in his room inhaling from an aerosol can of computer cleaner. He confronted Victor, who started punching the walls. McDaris called Gray but she didn't answer. He tried to carry Victor out of the house, but Victor squirmed away. McDaris beat him up and gave him a bloody nose and lip. Victor went home to Gray, and McDaris put Victor's belongings out on the driveway for Gray to pick up.

A few days later, on April 27, 2015, McDaris was asleep in his truck, parked in the driveway. Dominguez tapped on the window and asked McDaris if he could use his phone to call Gray. Bennett was standing nearby. The men went into the garage and smoked meth. Dominguez was cold so they went into the house. Dominguez shut the door behind him, and Bennett went into the bathroom. Then Dominguez pulled a 9-millimeter gun out of his waistband and asked McDaris if he " 'like[d] hitting on little kids.' " McDaris said Victor was 18 years old, and Dominguez replied he didn't care.

Dominguez told McDaris to sit on the couch, take off his shoes, and empty his pockets. Bennett came out of the bathroom and said, " 'So you like hitting on little kids,' " and McDaris replied, " 'Dude, just chill.' " Thinking they would just rob him, McDaris told Dominguez he could have his safe and everything in it. Then Dominguez told McDaris to get into the bathtub, and said if McDaris listened to them they would make it less painful. Bennett told him to listen to Dominguez and " 'get in the fucking bathtub.' " Dominguez went into McDaris's room to get the safe.

3

As McDaris still sat on the couch, Bennett "sliced" McDaris on the right shoulder with a big boxcutter because he wasn't moving fast enough, saying " 'you think I'm fucking with you' " and threatening to cut McDaris in the face. Bleeding everywhere and becoming weak from blood loss, McDaris started for the front door, but Bennett told him not to even think about it. McDaris headed to the back sliding door and ran outside. He jumped over the back fence, and hid across the street. He saw Dominguez and Bennett run out with the safe. They got into a car and drove away.

A neighbor who was a nurse put a tourniquet on McDaris's arm, and called for help. McDaris refused an ambulance and drove himself to a hospital, where he received 20 stitches.

McDaris's neighbor across the street testified he saw a fairly large, bloody laceration across McDaris's right shoulder, he called 911.

### 2. *Bennett's statements to the police*

The prosecution introduced into evidence transcripts of Bennett's police interviews.

Torrance Police Detectives Eric Bernier and Andrew Lee interviewed Bennett on July 2, 2015 after his arrest. Bennett said Dominguez told him he wanted to talk to McDaris, whom Bennett didn't know. He drove Dominguez to McDaris's house and got out. He assumed Dominguez was carrying a gun, and he understood "my . . . participation was just to get out and . . . beat the dude up."

They smoked dope in the garage, and then Bennett asked if he could use the bathroom. They went into the house. Dominguez had talked to McDaris about "beating and somebody get issued [sic]," and when Bennett came out of the bathroom,

"there was kind of something going on." Dominguez and McDaris were in the living room, and Dominguez told McDaris to take all his clothes off. Bennett had a little box cutter that he carried for protection. He told McDaris to stay still while Dominguez went to the back. When McDaris ran out, Bennett tried to grab him and grazed his arm with the boxcutter. Bennett jumped into his car, Dominguez ran out the door with the safe, and they drove off.

"The dude I think was a minor that got beat up, you know, so he was stripped down, all of his clothes and everything." That was probably why Dominguez made McDaris take off his clothes. "I thought [Dominguez] was going to beat [McDaris] up or whatever." Bennett had seen the kid earlier that week at a house, and "I don't like it . . . I seen that kid, you know, he was pretty beat up," and he understood he and Dominguez "were going to go beat [McDaris] up." He didn't know what was used to beat the kid up, but "his face was like swollen and shit."

The detectives let Bennett know the charges were assault with a deadly weapon and robbery, but that could change.

The detectives interviewed Bennett again at the jail four days later on July 6, 2015. Bennett explained that he, Dominguez, and Gray were at Gray's house getting high. Gray's son was in the room but Gray kicked him out. Gray gave Dominguez money and said she wanted this guy "beat up like the way her son was beat up. Her son was really fucked up." Bennett didn't know what the guy used to beat the kid up, but he knew the guy who beat him up was strong. The kid was in so much pain that he asked Bennett for painkillers, and Bennett felt really bad for him because "his shit was just fucked up." Bennett gave a ride home to Dominguez, who gave him $100.

5

A few mornings later, Bennett met Dominguez at a friend's house, and agreed to give Dominguez a ride. He didn't know they were going to McDaris's house, but when they arrived Dominguez told him whose house it was. Bennett waited in the car while Dominguez talked to McDaris, and then Dominguez told him to come in. The three men were getting high in the garage when McDaris mentioned the name of a kid who used to live there and stole things from him, saying: "I had to fuck him up." Bennett asked if he could use the bathroom inside the house. When he came out Dominguez and McDaris were in the living room. Dominguez showed a gun to McDaris, asked him, "[Y]ou like to fucking beat up little boys?," and told him to take everything off and go into the bathroom. Bennett didn't know what would happen in the bathroom, and thought McDaris might be killed. He didn't know Dominguez brought a gun, although he often carried one. "If I have something, I usually have a knife or something," and this time he had a boxcutter.

When Dominguez went into the back room, McDaris made a run for it. Bennett tried to grab him with the hand holding the boxcutter, cutting McDaris, who ran outside. Dominguez came out of the back room and Bennett told him, "[H]e ran, bro, I'm gone." Bennett went out to his car and was pulling away when Dominguez ran out with the safe. Bennett drove Dominguez back to his car. He never saw what was in the safe. McDaris had given him some glasses and a video game.

3.    *Defense evidence*

Bennett testified Dominguez asked him if he wanted to make some fast money, and the two men drove to Gray's house in Torrance. They smoked meth with Gray, who asked Dominguez if he could beat up someone who had beaten up her son.

Dominguez told Gray Bennett would help him rough the man up, and Bennett nodded.  Gray gave Dominguez $600 and promised him more after he took care of it.  Dominguez gave Bennett $100 up front for riding with him that day and as partial payment for helping him "carry out his rough-up."

Two weeks later, on April 27, 2015, Bennett dropped his girlfriend off at work and met up with Dominguez at a friend's house.  They smoked meth, and Bennett agreed to give Dominguez a ride.  Bennett did not think they were going to beat the guy up; he thought Gray had spent $600 for nothing, because it was "bullshit" and Dominguez often didn't follow up on things.

Dominguez gave Bennett directions as they drove to McDaris's house.  Bennett didn't know McDaris was the man Gray wanted them to beat up.  He pulled into the driveway and waited in the car while Dominguez talked to McDaris in the driveway, and then the men waved to him to come into the garage.  He parked his car and went into the garage with Dominguez and McDaris.

After they smoked meth that Dominguez had brought with him, Bennett asked McDaris if he could use the bathroom.  McDaris said no, but then he walked Bennett into the house through the front door.  Bennett came out of the bathroom and found McDaris and Dominguez confronting each other in the living room hallway.  Dominguez had his hand on a gun in his waistband, and told McDaris to take his "shoes and stuff" off because "he knew what time it was."  Then Dominguez told Bennett to watch McDaris, while Dominguez ran around the house "looking for stuff."  Bennett didn't know Dominguez had a gun on him.  He thought he or McDaris could get shot, and both of their lives were in danger.

7

Bennett had a full cast on his right hand, and he had a box cutter in his back left pocket. As he walked over to McDaris, he put the box cutter in his broken hand in case McDaris tried to jump him. He told McDaris to chill out, but he darted off and Bennett tried to grab him. He didn't get a full grasp, and when McDaris ran through his arms, the boxcutter grazed McDaris's shoulder. Bennett yelled that McDaris had escaped and walked out to his car, and as he began to drive off he saw Dominguez come out of the house with a box and his gun. Dominguez jumped into Bennett's car, and Bennett drove Dominguez back to his car. When Dominguez said he would try to get Bennett more money for the job, Bennett realized who McDaris was. Later that day, Dominguez sent him more money through a friend.

Bennett did not tell the police the whole story because that would make him look like a rat. He did not intend to help Dominguez assault McDaris, to assault McDaris, or to threaten him, rob him, or keep him inside the house. McDaris even gave him a pair of sunglasses and some video games. He had been high, and might have been a little paranoid. He felt bad about what happened, and cut McDaris by accident.

On cross-examination, Bennett repeated he did not know who McDaris was until he and Dominguez were driving away, and he was pretty sure he told the detectives that. His trial testimony was more complete than his two interviews with the police because then he was on drugs and "fresh off the streets," and he was sober now.

On redirect, Bennett said he had received the audio of his interviews the afternoon before his testimony. It was

8

"a possibility" that he had done all those things that day because he was scared of the gun and high on drugs.

The jury found Bennett guilty of count 1, conspiracy to commit assault by means of force likely to cause great bodily injury, and of count 6, false imprisonment by violence (but found not true the allegation that he personally used a deadly weapon, a box cutter). The jury found him not guilty of count 2 (first degree residential burglary), count 5 (first degree residential robbery), and count 7 (criminal threats). The jury hung on counts 3 (assault with a deadly weapon) and 4 (assault with a firearm), and the trial court declared a mistrial on those counts.

The court sentenced Bennett to nine years and four months in state prison, with four years doubled as a second strike on count 1, and a consecutive eight months, doubled as a second strike, on count 6. The court ordered Bennett to pay fines and fees, awarded custody credits, and dismissed counts 3 and 4. Bennett filed this timely appeal.

## DISCUSSION

Bennett argues the trial court committed prejudicial error when it failed to instruct the jury on the lesser included offense of conspiracy to commit simple assault. The court agreed to instruct the jury on simple assault as a lesser included offense to the assault with a deadly weapon charge in count 3 and the assault with a firearm charge in count 4 (the counts that resulted in a hung jury), but declined to give a simple assault instruction on count 1, the conspiracy count, of which the jury convicted Bennett.

Even without a request, a court trying a criminal case must instruct on general legal principles relevant to the issues raised by the evidence and necessary for the jury to understand the

9

case.  (*People v. Enraca* (2012) 53 Cal.4th 735, 759.)  To justify a lesser included offense instruction, substantial evidence—evidence from which a reasonable jury could conclude the facts supported the instruction—must appear in the record.  (*Ibid*.)  Evidence is substantial if it could persuade the jury that the defendant committed the lesser offense, but not the greater.  (*People v. Breverman* (1998) 19 Cal.4th 142, 162.)

"A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance of the conspiracy."  (*People v. Morante* (1999) 20 Cal.4th 403, 416.)  When the charge is conspiracy, "the criminal act is the agreement."  (*People v. Fenenbock* (1996) 46 Cal.App.4th 1688, 1708.)  Although the crime is not punishable unless some overt act was committed to further the conspiracy, "[i]t is the agreement, not the overt act in furtherance of the agreement, which constitutes the offense."  (*Id.* at p. 1709.)

To determine whether a lesser included instruction is required, we look at the criminal act (the "target offense") the conspirators agreed upon.  (*People v. Cook* (2001) 91 Cal.App.4th 910, 918.)  Section 182 requires the jury to determine the target crime the defendants conspired to commit, "and it cannot make that determination unless it is instructed on the elements of the target offense charged *as well as the elements of any lesser included target offense which the jury could reasonably find to be the object of the conspiracy*."  (*Cook*, at p. 918, italics added.)

Bennett does not dispute the existence of a conspiracy.  The question is whether a jury of reasonable people could

10

conclude that Bennett agreed with Dominguez to commit only a target offense of simple assault (§ 240), which is a lesser included offense of assault with force likely to produce great bodily injury (§ 245, subd. (a)(4)).  (*People v. McDaniel* (2008) 159 Cal.App.4th 736, 748.)  Simple assault is "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another."  (§ 240.)  Simple assault does not require a specific intent to injure the victim, but the defendant must " 'actually know[ ] those facts sufficient to establish that his act by its nature will probably and directly result in physical force being applied to another.' "  (*People v. Wyatt* (2012) 55 Cal.4th 694, 702.)  "No actual touching is necessary, but the defendant must do an act likely to result in a touching, however slight, of another in a harmful or offensive manner."  (*Ibid.*)  Assault by force likely to cause great bodily injury also can be committed without making actual physical contact with the victim, because the force must only be *likely* to produce great bodily injury, regardless of whether the victim suffers any harm.  (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028.)  The use of hands and fists alone may support a conviction for assault by force likely to cause great bodily injury.  (*Ibid.*)

All the evidence about the target offense of the conspiracy comes from Bennett's police interviews and his trial testimony. Bennett told the police he had seen Victor at Gray's house after McDaris beat him up, and he didn't like it.  Victor was "pretty beat up," and although Bennett didn't know what had been used to beat him up, "his face was like swollen and shit."  Bennett understood that Victor had also been stripped naked, and that he and Dominguez were going to beat McDaris up in retaliation.

11

In his second police interview, Bennett described Victor as "really fucked up," and in so much pain that he asked Bennett for painkillers. He felt terrible for Victor. He repeated he didn't know what had been used to cause Victor's injuries but he knew whoever beat Victor up was strong. Gray gave money to Dominguez, telling him she wanted McDaris to be beat up the way her son had been beaten.

Bennett testified Gray asked Dominguez "to beat someone up that had beat up her son," and he had nodded when Dominguez told Gray Bennett would help him rough McDaris up.

We do not think Bennett's statements contain substantial evidence he conspired to commit only simple assault. All the evidence is that Bennett felt distaste and pity when he saw Victor's serious injuries, and he agreed to help McDaris beat him up as badly as Victor had been beaten. No reasonable juror would conclude that Bennett agreed only to acts that would probably result in only minor injury to McDaris. (*See People v. Wyatt, supra*, 55 Cal.4th at p. 704.) Because "it would be speculative at best to construe the trial evidence in this case as supporting a verdict of only simple assault" (*ibid*.) as the target offense of the conspiracy, the trial court was not required to instruct on that lesser included offense.

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

EDMON, P. J.

DHANIDINA, J.

13