Filed 12/7/21  P. v. Vining CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DERWIN KEITH VINING II,<br><br>Defendant and Appellant. | E073060<br><br>(Super. Ct. No. BAF1700694)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Larry R. Brainard, Judge.  Affirmed with directions.

Christine Vento, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Elizabeth M. Kuchar, Deputy Attorneys General, for Plaintiff and Respondent.

# I.

## INTRODUCTION

A jury convicted defendant and appellant, Derwin Keith Vining, of child abuse homicide (Pen. Code, § 273ab, subd. (a))[1] of his girlfriend's four-year-old son, who died from the wounds defendant inflicted on him. The trial court sentenced defendant to 25 years to life in state prison.

On appeal, defendant argues the trial court prejudicially erred by (1) failing to sua sponte instruct the jury on involuntary manslaughter, (2) imposing an unconstitutional sentence, and (3) impermissibly imposing various fines, fees, and assessments. The People concede, and we agree, that a presentence incarceration fee must be stricken. We reject defendant's remaining contentions and affirm the judgment.

# II.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant started dating J.W. around the beginning of 2017. J.W. lived in apartment with her three children, eight-year-old A.J., five-year-old A., and four-year-old "Mar." Defendant did not live with J.W., but spent most of his free time at her apartment. At the time of Mar's death, defendant worked nights and stayed with the children at J.W.'s apartment while she worked during the day.

In June 2017, defendant went to J.W.'s apartment after his shift around 7:00 a.m. J.W. left for work and defendant went to sleep in J.W.'s bedroom.

---

[1] Unless otherwise indicated, all statutory references are to the Penal Code.

A few hours later, defendant was woken up by what sounded like a window breaking. Defendant went into the living room and told the children to do their homework instead of playing. A.J. asked defendant for some orange juice, and defendant poured a glass for the siblings to share. Mar spilled the glass of orange juice, which made defendant mad.

Defendant told A. and A.J. to go to their rooms and gave Mar a "whooping." After the beating, Mar threw up on the bathroom floor. Defendant then beat Mar again for throwing up and went back to sleep.

Mar went into the bedroom that he shared with A.J. and said "my stomach hurts" and "'[e]verything hurts.'" Mar writhed in his bed in pain and fell off twice. When Mar did not get up the second time, A.J. tried to wake up defendant, but defendant ignored him.

A.J. asked A. to help him. They could not lift Mar into his bed, so they put a blanket over him and waited for their mother to come home.

J.W. returned home a couple of hours later to check on her children. When she opened the door, A.J. ran to her and said something was wrong with Mar. J.W. found Mar lying face down and unresponsive. J.W. yelled for defendant. Defendant picked up Mar and ran cold water over him in the shower, but he remained unresponsive.

J.W. called 911. Paramedics arrived and took Mar to the hospital, where he was pronounced dead about an hour later.

3

## III.

## DISCUSSION

A.    *Involuntary Manslaughter Instruction*

Defendant asserts the trial court erred by failing to sua sponte instruct the jury on involuntary manslaughter because it is a lesser included offense of child abuse homicide. We assume without deciding that defendant is correct that involuntary manslaughter is a lesser included offense of child abuse homicide.

"[A] lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser. [Citations.]" (*People v. Birks* (1998) 19 Cal.4th 108, 117.)"

"The failure to instruct on a lesser included offense in a noncapital case does not require reversal 'unless an examination of the entire record establishes a reasonable probability that the error affected the outcome.' [Citation.] 'Such posttrial review focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the

4

defendant complains affected the result.' [Citation.]" (*People v. Thomas* (2012) 53 Cal.4th 771, 814, footnote omitted.)**2**

In other words, there must be substantial evidence is evidence from which a reasonable jury could find that the defendant committed the lesser offense, but not the greater offense. (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) Thus, the question here "is whether substantial evidence supported a conclusion that defendant committed *only* [involuntary manslaughter] and not child assault homicide." (*People v. Wyatt* (2012) 55 Cal.4th 694, 703.)

Child abuse homicide occurs when "'(1) [a] person, having the care or custody of a child under the age of eight; (2) assaults the child; (3) by means of force that to a reasonable person would be likely to produce great bodily injury; (4) resulting in the child's death.'" (*People v. Wyatt* (2010) 48 Cal.4th 776, 780-781.) Manslaughter is "the unlawful killing of a human being without malice" that occurs "in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might product death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b).) "In addition to these statutorily defined means of committing involuntary manslaughter, the California Supreme Court has defined a nonstatutory form of the offense, based on the predicate act of a noninherently dangerous felony committed

---

**2** We reject defendant's argument that the failure to instruct on involuntary manslaughter as a lesser included offense of child abuse homicide is reviewed for prejudice under the federal *Chapman* standard instead of the California standard. AOB 39 (See *People v. Thomas*, *supra*, 53 Cal.4th at p. 814.)

5

without due caution and circumspection." (*People v. Butler* (2010) 187 Cal.App.4th 998, 1007.) Thus, "there are three types of acts that can underlie commission of involuntary manslaughter: a misdemeanor, a lawful act, or a noninherently dangerous felony." (*Id.* at p. 1006.)

The mens rea for all three predicate acts is criminal negligence, which is "conduct that is 'such a departure from what would be the conduct of an ordinarily prudent or careful man under the same circumstances as to be incompatible with a proper regard for human life, or in other words, a disregard of human life or an indifference to consequences.' [Citation.]" (*People v. Butler*, *supra*, 187 Cal.App.4th at p. 1008.) This means that the defendant did "not intend to kill and [did] not act with conscious disregard for human life." (CALCRIM No. 580.) This is an objective inquiry which asks whether "a reasonable person would have been aware of the risk." (*Ibid.*)

We conclude it is not reasonably probable that the jury would have convicted defendant of involuntary manslaughter, but not child abuse homicide, if it had been given the option. It is undisputed that four-year-old Mar was in defendant's care when he died as a result of the injuries defendant inflicted on him. The evidence that defendant used force on Mar that a reasonable person knew would be likely to produce great bodily injury was overwhelming.

At the time of his death, Mar was four years old and about 42 pounds. Defendant admitted that he "whooped" Mar with a belt and his hand. Although defendant denied hitting Mar with a closed fist, defendant had swollen knuckles. These injuries were

6

consistent with defendant having hit Mar with a closed fist and showed his consciousness of guilt and awareness of the significant amount of force that he used to beat Mar. After defendant "whooped" Mar, Mar threw up. Defendant cleaned up the vomit and proceeded to assault Mar again for throwing up on the floor. Defendant went to sleep and ignored Mar's brother when he told defendant that Mar would not wake up.

Mar's injuries confirm that defendant used force that a reasonable person knew was likely to cause Mar great bodily injury. Mar had bruises and abrasions caused by blunt force impact (such as a fist) all over his body, including on his head, face, torso, and all of his extremities. The force defendant used caused bruising on Mar's diaphragm and lungs and lacerations on his liver and spleen, which caused severe bleeding. A physician testified that Mar's injuries were similar to those one would sustain in a motor vehicle accident, falling off of a two-story building, or being hit "very hard" by an adult with a "full-force punch."

The record thus overwhelmingly shows that defendant was guilty of child abuse homicide because he killed Mar by assaulting him with force that a reasonable person knew would likely cause great bodily injury. (*People v. Wyatt*, *supra*, 48 Cal.4th at pp. 780-781.) Given Mar's extensive, serious injuries and defendant's admission that he "whooped" Mar and then "whooped" him again after he threw up from the first "whooping," "the only possible inference the jury could draw from the evidence presented" is that a reasonable person would have known that defendant's assault on Mar was likely to cause him great bodily injury. (*People v. Evers* (1992) 10 Cal.App.4th 588,

7

597.)  A reasonable jury thus could not have found that defendant was guilty of only involuntary manslaughter and not child abuse homicide.  As a result, any error in failing to instruct the jury on involuntary manslaughter was harmless.

B. *Defendant's Sentence Is Not Unconstitutional*

Defendant argues his 25-years-to-life sentence violates the federal and California constitutions because it is "grossly disproportionate to his crime."  We agree with the People that defendant forfeited the issue by failing to object to the sentence on constitutional grounds.  (See *People v. Baker* (2018) 20 Cal.App.5th 711, 720.)  Nonetheless, we exercise our discretion to address the issue on the merits "to avert [defendant]'s claim of inadequate assistance of counsel."  (*People v. Yarbrough* (2008) 169 Cal.App.4th 303, 310.)  We conclude defendant's sentence is not unconstitutional.

"A punishment violates the Eighth Amendment if it involves the 'unnecessary and wanton infliction of pain' or if it is 'grossly out of proportion to the severity of the crime.'  [Citation.]  A punishment may violate article I, section 17 of the California Constitution if 'it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.'"  (*People v. Retanan* (2007) 154 Cal.App.4th 1219, 1230-1231.)

"Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare."  (*Rummel v. Estelle* (1980) 445 U.S. 263, 272.)  In *Rummel v. Estelle*, the United States Supreme Court held a life sentence for credit card fraud of $80, passing a $28.36 forged check, and obtaining

8

$120.75 was not grossly disproportionate in violation of the Eighth Amendment. Similarly, in *Lockyer v. Andrade* (2003) 538 U.S. 63, the Court upheld two consecutive 25-years-to-life sentences imposed for two thefts of items worth less than $150. Given that the United States Supreme Court has repeatedly upheld sentences of 25 years to life for minor property crimes, it follows that defendant's sentence of 25 years to life for child abuse homicide does not violate the federal constitution.

The California Constitution prohibits the infliction of cruel or unusual punishment. (Cal. Const., art. I, § 17.) A punishment violates the state constitutional mandate against cruel or unusual punishment "if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424 (*Lynch*), superseded by statute on other grounds as stated in *People v. Caddick* (1984) 160 Cal.App.3d 46, 51-52.)

Under the California constitution, we apply a three-pronged test in determining whether a sentence constitutes cruel or unusual punishment. (*People v. Cuevas* (2001) 89 Cal.App.4th 689, 702.) Under that approach, we (1) examine the nature of the offense and offender, (2) compare the punishment with the penalty for more serious crimes in the same jurisdiction, and (3) measure the punishment to the penalty for the same offense in different jurisdictions. (*Lynch*, *supra*, Cal.3d 410 at pp. 425-427.)

However, defendant focuses only on the first prong, so we need not engage in the second or third prong. (See *People v. Crittenden* (1994) 9 Cal.4th 83, 156-157.)

9

When applying the first prong of the *Lynch* analysis, we evaluate the defendant's personal characteristics, including his or her age, prior criminality, and mental capabilities. (*People v. Lucero* (2000) 23 Cal.4th 692, 739.) We also consider the circumstances of the current offenses, including the defendant's motive in committing the offense, the manner in which the crime was committed, and the consequences of the defendant's acts. (*Ibid.*; *People v. Dillon* (1983) 34 Cal.3d 441, 479.)

We conclude defendant's sentence is justified based solely on the nature of his offense. Defendant beat Mar, his girlfriend's four-year-old, 42-pound son, because he spilled a glass of orange juice. Mar immediately vomited afterwards, and defendant beat him again for vomiting. Mar told his brother that "everything" hurt as he writhed in pain before falling off his bed and losing consciousness. When Mar's siblings told defendant that something was wrong with Mar, defendant ignored them, did not check on Mar, and went back to sleep.

Defendant hit Mar so hard that it burst his spleen and liver, causing him to internally bleed to death in about 30 minutes. The wounds defendant inflicted on Mar caused defendant's knuckles to swell, which indicated that he hit Mar with a closed fist and significant force.

Although defendant has a limited criminal history, that does not outweigh the "seriousness of the crime and the circumstances surrounding its commission." (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 845.) At the time of his offense, defendant was 27 years old and was a father figure to Mar and his siblings. He does not suffer from any

10

intellectual or developmental disability, yet he brutally beat four-year-old Mar, inflicting mortal wounds, because he was upset with Mar's behavior. Given the immeasurable pain defendant inflicted on Mar, his siblings, and his mother, defendant's sentence does not shock the conscience or offend fundamental notions of human dignity. (See *People v. Christensen* (2014) 229 Cal.App.4th 781, 803-804 [27 years to life for five counts of lewd and lascivious conduct against three victims under the age of 14 not cruel or unusual]; *People v. Baker*, *supra*, 20 Cal.App.5th at p. 720 [holding sentence of 15 years to life for orally copulating six-year-old "is not so disproportionate as to exceed the very high constitutional threshold"].) Because we conclude defendant's sentence is constitutional, we reject his claim that his trial counsel was ineffective for failing to object to his sentence as unconstitutional.

### C. *Fines, Fees, and Assessments*

At sentencing, the trial court stated it would impose a $7,500 restitution fine (§ 1202.4, subd. (b)), a $7,500 parole revocation fine (§ 1202.45, subd. (b)), a $40 court operations assessment (§ 1465.8), a $30 criminal conviction assessment (Gov. Code, § 70373), a $514.58 booking fee (Gov. Code, § 29550.1), a $1,500 fee for presentence incarceration costs (§ 1203.1c), and $12,220.48 in victim restitution (§ 1202.4, subd. (f)). The trial court also indicated that it would require defendant to pay the costs of a

11

presentence probation report fee to be determined by the probation department and imposed at a later hearing, but that the fee would not exceed $1,095 (§ 1203.1b).[3]

Defense counsel informed the trial court that defendant did not have "the ability to make any payments" because he had no money. The trial court responded, "I believe under the circumstances of this case, I'm not supposed to actually make that finding at this time." The trial court then imposed the fines, fees, and assessments, except for the presentence probation report fee.

Defendant contends the $1,500 fee for his presentencing costs was unauthorized. He also contends the trial court erred by imposing the fines, fees, and assessments without determining whether he had the ability to pay them. Relatedly, defendant argues the trial court erred by declining to determine if he could pay the presentence probation report fee at sentencing. He therefore argues the matter must be remanded to allow the trial court to determine whether defendant can pay the fines, fees, and assessments.

As the People rightly concede, the trial court erroneously imposed the $1,500 fee for defendant's presentence incarceration costs. Section 1203.1c, subdivision (a) provides in relevant part that if "a defendant is convicted of an offense and is ordered to serve a period of confinement *in a county jail, city jail, or other local detention facility* as a term of probation or a conditional sentence," the court may order the defendant to pay "the reasonable costs of such incarceration." (§ 1203.1c, subd. (a), italics added.)

---

[3] The record does not disclose whether the hearing occurred or the amount defendant was ordered to pay for the presentence probation report.

12

The trial court sentenced defendant to state prison, not a county jail, city jail, or other local detention facility. Section 1203.1c, subdivision (a) therefore does not apply here. As a result, the $1,500 fee the trial court imposed for defendant's presentence incarceration costs was unauthorized and must be stricken. (See *People v. Scott* (1994) 9 Cal.4th 331, 354.) We therefore strike the $1,500 fee. (See *People v. Smith* (2001) 24 Cal.4th 849, 854 [appellate court may strike unauthorized sentence].)

As to the remaining challenged fines, fees, and assessments, defendant contends the trial court erroneously imposed them without determining whether he has the ability to pay them.

As for the $7,500 and $12,220.48 victim restitution fines, the trial court may impose a restitution fine even if the defendant cannot pay it. (*People v. Potts* (2019) 6 Cal.5th 1012, 1056.) Inability to pay is but "a factor for the court to consider in setting the amount of a restitution fine, alongside 'any relevant factors.'" (*Id*. at p. 1056.) In setting the restitution fines here, the trial court properly exercised its discretion after it considered defendant's argument that he could not afford the fines and fees. "The court was permitted to conclude that the monetary burden the restitution fine imposed on defendant was outweighed by other considerations." (*Id*. at pp. 1056-1057.) The trial court thus did not err in imposing the restitution fines without deciding whether defendant could pay them.

The remaining fees and assessments—a $40 court operations assessment (§ 1465.8), a $30 criminal conviction assessment (Gov. Code, § 70373), a $514.58

13

booking fee (Gov. Code, § 29550.1)—total $584.58. So, if the trial court later imposes the maximum $1,095 for the presentence probation report fee, defendant will be liable for at most $1,679.58 in fees and assessments.

We assume without deciding that the trial court erroneously imposed a probation report fee without determining whether defendant can pay it, and also assume that it will be the maximum $1,095. As to the other fees and assessments, because the trial court did not determine whether defendant could pay them, "[u]nder *Dueñas*, this was error, and we must remand for an ability to pay hearing unless the error was harmless." (*People v. Taylor* (2019) 43 Cal.App.5th 390, 401.) We conclude the error was harmless. We likewise conclude any error in imposing a presentence report fee was harmless.

Nothing in the record suggests defendant will not be able to work while serving his sentence. At the time of sentencing, defendant was 29 years old, and he has no reported health problems. We thus assume defendant will obtain a prison job paying the minimum of $12 per month. (See Cal. Code. Regs., tit. 15, § 3041.2.) We also assume the restitution fines will remain outstanding, which will leave defendant with $5.40 per month to settle at most $1,679.58 in fees and assessments. (*People v. Taylor*, *supra*, 43 Cal.App.5th at p. 402.) At that rate, defendant will pay off the fees in 311 months, or 26 years.

Thus, if defendant serves 26 years, he will have enough time to pay off the fees and assessments, even if the trial court later imposes the maximum amount for the presentence probation report. Accordingly, defendant "will have sufficient time to earn

14

[$1,679.58] during his sentence, even assuming [he] earns nothing more than the minimum." (*People v. Jones* (2019) 36 Cal.App.5th 1028, 1035.) And if he only serves 25 years of his sentence of 25 years to life and makes the minimum while incarcerated, he will make $1,620, leaving him with a balance of about $60 upon release. Because he would be in his mid-50s by then, he will have enough time to earn money to pay the outstanding fees and assessments. (*Ibid.*; *People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837 [court may consider defendant's future earnings in prison and after release in determining defendant's present ability to pay]; *People v. Ramirez* (1995) 39 Cal.App.4th 1369, 1377 [a trial court may consider the defendant's future ability to pay, including his ability to earn wages while in prison]; *People v. DeFrance* (2008) 167 Cal.App.4th 486, 505 [defendant sentenced to prison did not show absolute inability to pay $10,000 restitution fine even though prison wages would make it difficult for him to pay the fine, it would take a very long time, and the fine might never be paid].)

Thus, on this record, any *Dueñas* error as to the fees and assessments was harmless beyond a reasonable doubt. (*People v. Jones*, *supra*, 36 Cal.App.5th at p. 1035.) The trial court therefore did not prejudicially err in imposing the fines, fees, and assessments without determining if defendant had the ability to pay them.

IV.

DISPOSITION

The $1,500 fee imposed for defendant's presentence incarceration costs is stricken. The judgment is affirmed as modified. The trial court is directed to prepare an

15

amended abstract of judgment reflecting the judgment as modified, and to forward a

certified copy of the amended abstract of judgment to the Department of Corrections and

Rehabilitation.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

MILLER
Acting P. J.

RAPHAEL
J.

16